[No. 8836.   Department One.   August 1, 1910.]

MARGARET C. ENGELKING, *Respondent*, v. THE CITY OF

SPOKANE, *Appellant*.[1]

MASTER AND SERVANT—ASSUMPTION OF RISKS—CONTRIBUTORY NEGLIGENCE—KNOWLEDGE OF NATURAL LAWS—EXTRAORDINARY DANGER—EVIDENCE—QUESTION FOR JURY. Common laborers were not guilty of contributory negligence and did not assume the risk, as a matter of law, in attempting to float a raft under a new city bridge to remove the false work, where it appears that they were instructed to construct the raft, to be secured by a two-inch cable to a railroad bridge 200 feet above, and float in down to an end arch of the new bridge, that the raft was carried up and out to the center of the stream by an eddy, and the strength of the current on the cable was sufficient to pull down and submerge the raft with the men upon it, until it could no longer be held; nor can it be said that they had knowledge of and were bound by natural laws, since they were not so obvious as to prompt the instinct of self-preservation, and the dangers were extraordinary and not likely to be appreciated.

SAME—NEGLIGENCE OF MASTER—DUTY OF SUPERINTENDENCE — EXTRAORDINARY HAZARDS. In such a case the extraordinary hazard created by the weight of the raft—8,000 of 9,000 pounds—the heavy rope, the current of the stream, and the proximity of the falls, placed upon the city an imperative duty of superintendence over common laborers engaged in floating the raft into position under the bridge, for the want of which the city would be liable.

APPEAL—REVIEW—INSTRUCTIONS—HARMLESS ERROR—MASTER AND SERVANT—ASSUMPTION OF RISK. An instruction to the effect that a servant assumes ordinary risks, "provided the master has used ordinary diligence to eliminate them" is not necessarily prejudicial

[1] Reported in 110 Pac. 25.

where it did not stand alone, and in·a number of other instructions the law of assumption of risk is clearly set forth so that the jury could not have been misled.

MUNICIPAL CORPORATIONS—STREETS—BRIDGES—LIABILITY FOR NEGLIGENCE. The construction of a bridge across a stream is a ministerial rather than a governmental function, for which a city is answerable to its employees for its negligence.

Appeal from a judgment of the superior court for Spokane county, Huneke, J., entered December 13, 1909, upon the verdict of a jury rendered in favor of the plaintiff, in an action for the wrongful death of an employee. Affirmed.

*E. O. Connor* and *Danson & Williams*, for· appellant.

*Robertson & Miller* and *Harry Rosenhaupt*, for respondent.

CHADWICK, J.—At the time of his· death, H. W. Engelking was a common laborer in the employ of the city of Spokane. The city was engaged in erecting a concrete bridge over the Spokane river, a short distance above the falls. The bridge had been so far completed as to warrant the removal of the false work sustaining the arches, of which there were several. High water had taken out the false work from under the second arch, and the wooden forms had been moored by cables to the Great Northern railway bridge, a structure which paralleled the city bridge about two hundred feet up the stream and to the east. These forms were lying near the shore, with the bow of the arch to the center of the stream. In consequence, the flow of the current along the shore line was naturally deflected toward the center arch of the city bridge. A few feet below the concrete structure, a temporary bridge had been erected. A part of this had gone out a short time before, but it was in place below the south arch, so that anything floating under the south arch would lodge against it and be thus prevented from being carried over the falls.

Engelking and four others were directed by the foreman in charge for the city to take some timbers then at hand and

make a raft, to be floated down under the south arch and upon which they could stand while removing the false work. No further direction or superintendence was given or had over the men, although one of their number "seemed to take the lead." Accordingly the men took eight sticks, ten by ten, with cross-pieces leaving a space between each two of them, so that when the framework was completed the raft was about fourteen feet wide and twenty feet long. Upon this they erected a superstructure to bring them within reach of the top of the arch. When the raft had been completed it is estimated that it weighed from eight·to nine thousand pounds. Between the moored arches and the south span of the bridge, there was an eddy in the stream. In this, and about thirty or forty feet above the city bridge, the raft was moored, that point being also about sixty or sixty-five feet south of the pier upon which the center and south arches centered. The raft had been let down into the eddy and was secured by a long rope, two inches in diameter, attached to the Great Northern bridge, about seventy-five feet from the shore. Other ropes were attached to the raft. There is testimony going to show that one of these should have been used as a guy rope, to be held or tied on the shore while the raft was let down under the arch; while the other was to be used in securing the raft to the bridge. On the other hand, there is testimony showing that the large cable was alone depended on to let the raft down, while both of the smaller ropes were intended to secure the raft to the bridge when in proper position. The jury having found for plaintiff, we shall accept her theory as the true fact in the case.

When all was done, one of the workmen crossed the river to get some tools. Another went up to the Great Northern bridge to man the cable, the end of which was wrapped around a batter post on the Great Northern bridge. While the workman was going up the bank of the stream to man the cable, the rope which snubbed the raft to the shore was cut loose, so that when he first observed the raft after reach-

ing his post, it was drifting up and out into the stream, carried up on the eddying waters, and out by the long sweep of the two hundred and forty-foot cable, the most of which was submerged and a part of which had been struck by the main current of the stream. The cable described a sweep or curve so that, at some time the segment of the curve must have been below or to the west of the upper end of the raft. Whether Engelking and one of his companions pushed the raft out with pike poles is a disputed fact, but not material as we view the case. As the raft caught the swift current, the force of the current fell upon the cable, drifted the raft rapidly out to the center and, as soon as the cable straightened out, pulled it under the surface. Those on the raft having no means of controlling it, the workman on the bridge was signalled to let out more rope, and when he did so the raft rose to the surface, but when the rope came taut the raft was again pulled under the water, this time about two and one-half or three feet, or to the waist line of the men thereon. This continued until the workmen could no longer hold the rope, and the raft, being then opposite and almost under the center arch, was carried through it and over the falls. One of the workmen escaped and was a witness at the trial. The other two lost their lives. This action is prosecuted by the widow of Engelking, and from a judgment in her favor, the city has appealed.

Counsel for appellant has aptly summarized the theories upon which a recovery was sought and must rest if sustained. He says:

"(1) That these 10x10 timbers, forming the foundations of the raft, had, a month previous, been green timbers, and had, during the month preceding, been lying in the water. (2) That the rope by which the raft was moored to the Great Northern bridge was too heavy. (3) That there was no foreman over these men and in charge of the construction of the raft."

The first two grounds may be summarily disposed of. It

may be conceded—for the testimony shows—that the raft and the rope would, under ordinary conditions, or under the anticipated conditions—that is, if the raft had been floated under and moored beneath the south arch—have been a sufficient and proper appliance. The scheme failed because the workmen did not appreciate the danger arising from the submerged cable, the rapid flow, and conflicting currents of the stream which carried the raft beyond the south arch and opposite the center arch, and the further fact that the strength of the current was sufficient to pull the raft under the water when its weight came squarely upon the rope.

It is argued that these things resulted because of natural laws known to all, and that, by an exercise of the faculties with which all men are endowed, the danger would have been foreseen and avoided. *Beltz v. American Mill Co.*, 37 Wash. 399, 79 Pac. 981; *Bier v. Hosford*, 35 Wash. 544, 77 Pac. 867, and *Cavaness v. Morgan Lumber Co.*, 50 Wash. 232, 96 Pac. 1084, are cited to sustain this contention. Notwithstanding the forceful argument of counsel, the cases cited cannot be made to apply here. The workmen were directed to meet, not an ordinary, but an extraordinary condition. 1 Labatt, Master & Servant, 240; *Anderson v. Columbia Imp. Co.*, 41 Wash. 83, 82 Pac. 1037, 2 L. R. A. (N. S.) 840. It is true that, as viewed by learned counsel and by those versed in the laws of mechanics, the result might have been expected as a consequence of the violation of natural laws. But it is not to be expected that a common laborer will have knowledge of, or be bound by, natural laws, unless they are so obvious as to prompt the instinct of self-preservation in men of ordinary prudence and understanding. The wonders of this age of invention come from the application of natural laws. The touch of genius rather than the strength of reason has unlocked their mysteries, so that even learned men could not be charged with knowledge of them. Men are not bound to observe or act upon natural laws unless they are within the range of common understanding. That four men

acting in harmony having no understanding that the cross currents and torrential flow of the stream striking against a two-inch cable would overcome the natural law which held the raft in its place before it was pushed out into the stream, is the best evidence that they are not to be charged with the assumption of risk or contributory negligence as a matter of law; for, if they knew or appreciated the danger, the instinct of self-preservation, which is the first law of nature, would have restrained them. In any event, it is a question upon which the minds of reasonable men may differ, and the jury having found by special verdict that Engelking and his companions did not appreciate the danger, satisfies us that he was not guilty of assumption of risk or of contributory negligence.

The weight of the raft, the heavy rope, the current of the stream, and the proximity of the falls, made the superintendence of a qualified person an imperative necessity. In *Anderson v. Globe Nav. Co.*, 57 Wash. 502, 107 Pac. 376, we held that the business of loading a schooner with lumber could not be carried on without superintendence. While this case is not in point upon the fact, it nevertheless furnishes a source from which the legal conclusion may be drawn that the duty of superintendence is not a fixed legal duty, but may arise from the facts of any given case. In that case the servant was entitled to the immediate and watchful care of one who could warn him against dangers that he could not foresee. In this, the servant was entitled to the superintendence and direction of a skilled person, so that dangers which would not be foreseen by a person of only common understanding might be avoided. The hazard was extraordinary.

"When the servant is thus required to work amidst new surroundings or to undertake new duties, the master becomes at once chargeable with the obligation of giving him instructions in any case where there is a real augmentation of the risks, owing to the fact that the servant has not sufficient experience or intelligence to enable him to safeguard himself." Labatt, Master & Servant, p. 541.

"It is the duty of the master to supervise, direct and control the operation and management of his business so that no injury shall ensue to his employees through his own carelessness or negligence in carrying it on, or else to furnish some person who will do so, and for whom he must stand sponsor." Thompson, Negligence, § 3805.

That it is the ordinary and not the extraordinary danger, arising from the violation of some rule of science or mechanics not likely to be appreciated by the man of ordinary prudence, which binds the servant to the law of assumption of risk is the logic of *Cook v. Chehalis River Lumber Co.*, 48 Wash. 619, 94 Pac. 189, where the court said:

"The rule undoubtedly is that a servant assumes the risk of injury from dangers incident to his employment which are apparent to him and which the master does not undertake to remedy as an inducement to keep the servant at work, or is under no duty of positive law to discover and remedy. But this doctrine, it seems to us, has no application to the case before us. Here, clearly, the danger causing the injury was not one ordinarily incident to the employment. On the contrary, if the respondent's evidence is to be believed, the injury was caused by the grossest kind of negligence on the part of the appellant's foreman who was in immediate charge of the work. He directed a thing to be done which the slightest investigation must have told him would be highly dangerous to both of the men who were engaged in work at the foot of the trestle. The tightening of the rope, in the position it was placed by his orders, must necessarily throw off the planking from the projecting timbers, and it was gross carelessness to do this without warning the men below of their danger. This danger was not, therefore, a danger incident to the employment. It was one caused by the negligent acts of the appellant's foreman, and one which he could have avoided by using even ordinary prudence."

Many cases are cited by counsel on both sides, but, inasmuch as this case depends upon general and obvious rules of law, it would extend our opinion to an inordinate length to review them.

Among other instructions complained of, the following is vigorously assailed:

"The law also provides that the servant is held to assume the ordinary risks usually incident to his employment so far as they may fairly be presumed to be within his knowledge in the exercise of ordinary care, *provided the master has used ordinary diligence to eliminate them.*"

It is insisted that the italicized part denies to appellant its defense of assumption of risk. We are not advised as to the theory of the court in injecting the words objected to, and if this instruction stood alone it might not be sufficient for the guidance of the jury. Its meaning is not plain, but in other instructions, not in one but in a number, the law of assumption of risk is clearly set forth, so that upon the entire charge the jury could not have been misled. The verdict being consistent with the evidence, we had rather believe that the jury followed the true rule, emphasized as it was by the repeated utterances of the court, than that it was governed entirely by what seems to us to be a misprision on the part of the court. *Hoseth v. Preston Mill Co.*, 49 Wash. 682, 96 Pac. 423. Objections are made to other instructions, but we think they state the law when considered in connection with other instructions, and are consistent with the law of the case as we have found it to be.

Lastly, it is contended that the city cannot be held liable because it was acting in a governmental capacity, and not in the capacity of a private corporation. While there is a diversity of opinion and a divided authority upon this question, it seems to have been settled in this state that the construction and repair of highways is to be regarded as a ministerial rather than a governmental function, and that the city is therefore answerable for its negligence. *Sutton v. Snohomish*, 11 Wash. 24, 39 Pac. 273, 48 Am. St. 847; *Prather v. Spokane*, 29 Wash. 549, 70 Pac. 55, 92 Am. St. 923, 59 L. R. A. 346. In *Cunningham v. Seattle*, 40 Wash. 59, 82 Pac. 143, 4 L. R. A. (N. S.) 629; *Id.*, 42 Wash. 134, 84 Pac. 641, the case upon which appellant principally relies, the distinction between that case and the case at bar is noted by a quotation from *Sutton v. Snohomish:*

"In the first place, we are of the opinion that the laying out, repairing and controlling of streets by a chartered municipal corporation does not call forth the exercise of strictly governmental functions.   In the performance of such duties, however imposed, the municipality acts primarily for the benefit of the inhabitants of the particular locality.   In preserving the peace, caring for the poor, preventing the destruction of property by fire, and preserving the public health, it assumes duties which are said to be in their nature solely governmental (Jones on Negligence of Municipal Corporations, ch. IV), and for the nonexercise, or negligent exercise, of which the corporation is not generally liable to individual citizens.   But the duty to keep streets in repair is a municipal or ministerial duty, for a breach of which an action will lie in favor of a party injured thereby.   *Denver v. Dunsmore,* 7 Colo. 328, 3 Pac. 705.".

Whether the reasoning employed to draw the distinctions between the *Sutton* case and the case of *Cunningham* be good or bad, it is the established law in this state, and we are not disposed to question it in the absence of legislative direction. This conclusion makes it unnecessary for us to notice specifically other assignments of error, they being covered by the general propositions advanced.

The judgment of the lower court is affirmed.

RUDKIN, C. J., GOSE, and FULLERTON, JJ., concur.