[No. 9807.   Department One.   February 7, 1912.]

MARGARET BLAIR PARR et al., Respondents, v. THE CITY OF SPOKANE, Appellant.[1]

MASTER AND SERVANT—NEGLIGENCE—SAFE PLACE—EVIDENCE—SUFFICIENCY.   Negligence in lowering a heavy bucket, containing three tons of concrete, into the forms for a bridge pier, while the bucket was swinging, whereby it broke the forms and caused the death of an employee at the base of the pier, is a question for the jury, where the city engineer testified that a swinging bucket should be stopped by the signalman before it entered the forms, which was not done, and a witness testified that the bucket had a swing of 10 or 12 feet; and it is immaterial that no witness testified as to what caused the swinging, or how it could be stopped; the inference from natural laws being sufficient.

MASTER AND SERVANT—ASSUMPTION OF RISKS—SAFE PLACE—NEGLIGENCE OF SIGNALMAN—FELLOW SERVANTS.   A servant working by order of the foreman at the base of a bridge pier while the forms were being filled with concrete, may assume the safety of the place, and does not assume the risk of negligence of the signalman whereby a bucket of concrete broke the forms; as the signalman is not a fellow servant but a vice principal performing a nondelegable duty of the master.

Appeal from a judgment of the superior court for Spokane county, Sullivan, J., entered May 19, 1911, upon the verdict of a jury rendered in favor of the plaintiff, in an action for wrongful death of a city employee.   Affirmed.

[1]Reported in 121 Pac. 453.

*Cannon, Ferris, Swan & Lally (A. M. Craven, of counsel),* for appellant.

*Dewart & Fouts,* for respondents.

Gose, J.—The plaintiffs, the widow and minor children of George Wesley Parr, deceased, brought this action to recover damages arising from his death, alleging that he lost his life in consequence of the defendant's negligence, while in its employ. There was a verdict and judgment for the plaintiffs. The defendant has appealed.

The appellant, at the time of the happening of the accident, was engaged in the construction of a concrete bridge across the Spokane river, at Monroe street. The plan adopted required the erection of high concrete piers. The piers on the south side of the river had been built up to a height of about forty-seven feet. In carrying on the work, the concrete was placed in wooden forms. These forms were six to eight feet in height, eight feet in width, and about seventeen feet in length, and rested on the top of the piers. They were made of heavy timbers, set transversely, to which were nailed or spiked smaller timbers, placed vertically, and to these were nailed light boards or planks, thus forming a box-shaped receptacle open at both ends. The larger timbers were held together by rods, passing from side to side and fastened by nuts and washers. The concrete was emptied into the forms and put in place by men within. After the concrete had hardened, the forms were removed. The concrete was mixed on the north side of the river, where it was emptied into buckets weighing about three tons when filled. These buckets were then elevated to an overhead cable, and carried to a point directly above the forms, by means of a traveler running upon the cable, the power being supplied by an engine on the north side of the river. The cable was about one hundred feet above the forms, and attached at either end to a tower. The bucket was attached to the traveler by a cable running through a block and tackle and

was controlled by the engine. A signalman stood upon a platform between the piers at the south side of the river, which was so elevated that he could see into the forms. The signals were given by means of a telephone. When the bucket reached a point immediately above the forms, he gave a signal to the engineer to stop the traveler, and then gave him a second signal to lower the bucket into the forms. A short time before the accident, the deceased had been directed by one of the foremen to remove certain wooden braces at the base of the east pier, and was engaged thereat when he was killed. His death was caused in this manner: The signalman gave the signal to lower the bucket and it was lowered into the form while swinging, thus causing it to strike the end of the form, breaking it loose and precipitating it upon the deceased, causing his death.

At the close of the respondents' evidence, the appellant moved for a nonsuit and, after all the evidence was submitted, it moved for a directed verdict. After return of the verdict, it moved for a judgment notwithstanding the verdict. The denial of these motions raises the first and principal question presented by the appeal. The appellant contends that there is no evidence of negligence. On the other hand, the respondents' position is that the jury was warranted in finding that it was negligence to lower the bucket into the form while it was swinging. The evidence touching this question is as follows: A Mr. Beardsley, the foreman for the appellant in the construction of the forms, was introduced as a witness by the respondents, and asked what caused the form to fall. He answered: "The bucket struck it and knocked it down." He was then asked: "Was that bucket controlled by signals?" and answered: "Yes, sir. He controlled it as far as he could, and the bucket came down swinging and knocked it down." Mr. McCartney, the city engineer and superintendent in charge of the work, testified in behalf of the appellant that the signalman stood upon a platform between the two south piers so that he could see into

the forms; that when the bucket reached the desired position, he gave the engineer a signal to stop the carriage, and that, when this signal had been obeyed, he gave a signal to lower the bucket into the form. He was then asked what the result would be if the bucket was swinging when it reached a point near the form, and answered: "In that case the signalman would give the signal for the bucket to stop, and that bucket most always would swing when it would reach that point, and the signalman would give his signal to stop it." The next question propounded was: "That is, the engineer would stop his engine?" The answer was: "The engineer would stop his engine, yes. In this case the bucket wasn't stopped until it got inside the form." Another witness introduced by the appellant was asked the question whether there was any way to keep the bucket from swinging, and answered: "Not that I know of." This witness also stated that the bucket had a swing of approximately ten or twelve feet, but that he could not estimate it "within four or five feet."

It seems clear to us from this testimony that the jury had abundant warrant for finding the appellant guilty of negligence. The reasonable interpretation of the testimony of the superintendent is that the failure of the signalman to give a stop signal before the bucket reached the form was the proximate cause of the death of the deceased. It must have been apparent to him that, with the swing which the bucket had developed, it would strike the form if lowered into it at that time. He knew the approximate weight of the bucket, and it was his plain duty to stop it until its motion had been sufficiently arrested to make it reasonably safe to lower it into the form. The appellant does not meet the issue by saying that it does not know what caused the bucket to develop so wide a swing at the time in question, and that it does not know how its motion could have been arrested. It cannot plead ignorance of simple natural laws. Common observation and experience teach that the sweep

would have grown gradually less if the bucket had been stopped above the form. The signalman was representing the master, and the question whether he used reasonable care was, to our minds, one for the jury to determine. The fact that no witness testified to either the precise cause of the swing of the bucket, or to how its swing could have been lessened or arrested before it entered the form, is not controlling upon the jury. No rule of law is better established than that any inference which may reasonably be drawn from proven or admitted facts is just as competent evidence as the facts themselves, and may be considered by the court and the jury in determining where the truth lies. This view is well stated by Justice Dunbar, in *Mischke v. Seattle*, 26 Wash. 616, 67 Pac. 357, where he said:

"But it must be borne in mind that it is not sufficient to justify the court in taking the case from the jury that the facts be undisputed, but it must also appear that there is no room for a difference of opinion as to the inferences and conclusions to be drawn from admitted facts."

In *Steele v. Northern Pac. R. Co.*, 21 Wash. 287, 57 Pac. 820, the court quoted with approval from vol. 2, Thompson on Negligence, page 1236, as follows:

"It is frequently stated that, when the facts are undisputed or conclusively proved, the question of negligence is to be decided by the court. A better opinion, however, would seem to be that, in order to justify the withdrawal of the case from the jury, the facts of the case should not be undisputed, but the conclusion to be drawn from those facts indisputable. Whether the facts be disputed or undisputed, if different minds may honestly draw different conclusions from them, the case should properly be left to the jury."

See, also, *Campbell v. Jones*, 60 Wash. 265, 110 Pac. 1083. That the question of the appellant's negligence was for the jury to determine finds support in the following cases: *Hilgar v. Walla Walla*, 50 Wash. 470, 97 Pac. 498, 19 L. R. A. (N. S.) 367; *Campbell v. Jones, supra; Grosjean v. Denny-Renton Clay & Coal Co.*, 62 Wash. 196, 113 Pac. 570;

*McLeod v. Chicago, Milwaukee etc. R. Co.*, 65 Wash. 62, 117 Pac. 749.

The appellant relies upon *Nordstrom v. Spokane & Inland Empire R. Co.*, 55 Wash. 521, 104 Pac. 809, 25 L. R. A. (N. S.) 364, and kindred cases from this and other courts. In that case, the plaintiff lost an eye in consequence of steel filings getting into the eye while sawing steel lugs. He admitted that he knew that the fine dust produced by the sawing of the lugs had theretofore gotten into the eyes of other employees, and that it caused an inflammation of the eye. His contention was that he did not know that it might result in a loss of an eye. A recovery was denied, upon the ground that it was one of that class of accidents which are so rare, unexpected, and unforeseen that the master, in the exercise of reasonable care, could not be held to have anticipated it.

The appellant pleaded affirmatively, (1) that the deceased assumed the risk, and (2) that the negligence which caused his death, if there was any negligence, was that of a fellow servant "in the manner of lowering the bucket." The court instructed the jury to disregard these defenses. This is assigned as error. In considering the question of assumption of risk, it is to be remembered that the deceased was working at the base of the pier, where he had been directed by the foreman to work about an hour before he lost his life. The order was an implied assurance that the place was safe. As was said in *Cox v. Wilkeson Coal & Coke Co.*, 61 Wash. 343, 112 Pac. 231:

"He had been called by one in authority over him, and told the place was safe. It was his duty to obey the call, and in so doing he could rely upon the safety of the place to which he was called."

It is well settled that he did not assume the risk of the master's negligence. *Anustasakas v. International Contract Co.*, 57 Wash. 453, 107 Pac. 342; *Anderson v. Globe Nav. Co.*, 57 Wash. 502, 107 Pac. 376; *Bailey v. Mukilteo Lum-*

*ber Co.*, 44 Wash. 581, 87 Pac. 819. Nor did the fellow-servant rule apply to him. He and the signalman were working for a common master, but were not engaged in a common employment. The deceased was not so situated that he could take precautions against the negligence of the signalman. Moreover, as we have stated, the signalman was performing the work of the master and was a vice principal. We think a mere reference to the facts demonstrates the soundness of this view. *Jacobsen v. Rothschild*, 62 Wash. 127, 113 Pac. 261; *Engelking v. Spokane*, 59 Wash. 446, 110 Pac. 25, 29 L. R. A. (N. S.), 481; *Jock v. Columbia & Puget Sound R. Co.*, 53 Wash. 437, 102 Pac. 405; *Hale v. Crown Columbia Pulp & Paper Co.*, 56 Wash. 236, 105 Pac. 480; *Grosjean v. Denny-Renton Clay & Coal Co., supra; Martin v. Hill*, 66 Wash. 433, 119 Pac. 849.

The court instructed the jury as follows:

"Where in carrying on work it is necessary that some of the work be directed by signals the signalman designated by the master occupied the position of the master so far as the giving of the signals was concerned, and his wrong signal or failure to signal is the wrong signal or failure of the master."

Error is assigned to this instruction. What we have already said disposes of this question. The other instructions given by the court were within the issues and correctly stated the law of the case.

The judgment is affirmed.

DUNBAR, C. J., FULLERTON, PARKER, and MOUNT, JJ., concur.