HOLMBERG v. LAKE SHORE & MICHIGAN SOUTHERN
RAILWAY CO.

1. RAILROADS—MASTER AND SERVANT—NEGLIGENCE—RULES—CON-
TRIBUTORY NEGLIGENCE—OPERATION OF TRAINS.

Plaintiff, a freight engineer, in charge of a gravel train,
was injured in a collision with defendant's passenger train,
which he claimed was running ahead of time and at
excessive speed.  His own testimony showed that he was
operating his train in violation of defendant's rules re-
quiring the engineer to protect the head of his train and
to enter a switch or spur with it, at least five minutes
ahead of the schedule time of the passenger.  He knew
the surroundings and the lay of the tracks which contained
a reverse curve at the point of impact, shutting off the
view ahead.  Plaintiff's train was an extra and inferior
one, that the rules required him to guard by protecting
against the regular passenger train, whose time he knew
closely coincided with the time on which he was running.
Claiming that at 8:03 a. m. somewhat over 700 feet from
the switch that he trying to make, the passenger train,
due at the switch at 8:05, collided with his freight engine
and cars, plaintiff brought action based upon the Federal
employers' liability act.  (4 U. S. Comp. Stat. 1913, § 8659.)
Held, that the trial court erred in leaving to the jury the
question of contributory negligence, but should have in-
structed them that plaintiff was guilty of negligence affect-
ing or diminishing his right to damages for the injuries
received.[1]

2. SAME—FELLOW SERVANTS—CONTRIBUTORY NEGLIGENCE—FEDERAL
STATUTE—NEGLIGENCE.

It is the duty of State courts to accept jurisdiction and
enforce the Federal statute if their jurisdiction as estab-
lished by local laws is adequate, and as to the requirement
affecting the burden of proof, the rule is beyond mere
matters of State procedure, and these courts must follow
the Federal regulations.[2]

[1]On constitutionality, application and effect of employers' lia-
bility act, see notes in 47 L. R. A. (N. S.) 38, L. R. A. 1915C, 47.
[2]The power of State court to enforce right under Federal em-
ployers' liability act is discussed in notes in 40 L. R. A. (N. S.)
684.

3. SAME—EVIDENCE—DIRECTED VERDICT—ONUS PROBANDI.

Assuming that under the congressional enactment the allegation that plaintiff was without fault or negligence as set up in the declaration is surplusage and need not be established, yet if plaintiff's negligence is shown by his own evidence, the defendant may have the benefit, notwithstanding that the *onus probandi* as to contributory negligence may be shifted by the express language of the statute; any presumption of law that plaintiff was not at fault being overthrown by plaintiff's proofs, or the undisputed evidence, his right of recovery must be considered barred, and a verdict ought to be instructed.

4. SAME — DIRECTED VERDICT — COMPARATIVE NEGLIGENCE — NEW TRIAL.

Where the amount of the verdict indicates that the jury did not take into consideration the statutory requirement that plaintiff's negligence be taken into consideration as diminishing the damages recoverable but for his said fault or neglect, the judgment should be set aside on motion for a new trial.

5. SAME—INTERSTATE COMMERCE—REPAIRS AND IMPROVEMENTS— TRACK MAINTENANCE.

Testimony that defendant's road extended into a foreign State, that it regularly engaged in interstate traffic and plaintiff's freight train was hauling gravel for use in repairing and improving the roadbed used for these purposes, sufficiently established that plaintiff was engaged in furthering interstate commerce, and brought him within the act.

6. SAME—EVIDENCE.

Track repairs and maintenance facilitate and are essential to interstate commerce, and the work of an employee, who is engaged thereon is so directly concerned with and beneficial to all commerce which uses the road, that it must be *held* to bring the servant within the limits of the statute.

Error to Kent; McDonald, J. Submitted April 19, 1915. (Docket No. 32.) Decided December 21, 1915.

Case by Carl O. Holmberg against the Lake Shore &

Michigan Southern Railway Company for personal injuries.   Judgment for plaintiff.   Defendant brings error.   Reversed.

*Clapperton, Owen & Hatten* (*Samuel H. Kelley*, of counsel), for appellant.

*Lombard, Hext & Washburn*, for appellee.

STEERE, J.   On June 18, 1913, shortly after 8 a. m., a loaded gravel train of 16 cars, hauled by a heavy freight engine, south-bound from Grand Rapids to Three Rivers, running as "Extra 5761," met in a head-on collision a regular north-bound passenger train, No. 532, consisting of four cars and a passenger engine, on a reverse curve of defendant's road at the north yard in the city of Kalamazoo.   The engineer and conductor of the passenger train were killed and several of the passengers injured.   Plaintiff was engineer on the gravel, Extra 5761, and the only person injured on his train, his foot having been caught between the beams of the tank and engine as he was about to leave his cab and the lower part of his leg crushed, necessitating amputation about three inches below the knee.   He brought this action in the circuit court of Kent county, under the Federal employers' liability act, to recover damages for such injury, the negligence charged being that the passenger train was ahead of time and running at an excessive rate of speed, without a proper lookout being maintained.   In the trial court he recovered a verdict and judgment for $8,000.   A subsequent motion for a new trial, alleging, amongst other things, that the verdict was excessive and against the overwhelming weight of evidence, was denied.

Passenger train No. 532, going north on its regular run, was about 300 feet in length, and consisted of its engine, a mail car, baggage car, and two passenger

coaches. It was what is classed in railroad operation as a "superior train," with schedule time and precedence over all other trains. By its schedule time it was due to leave the Kalamazoo central station at 8 o'clock. Its time at the north yard switch was 8:05; the collision occurred 720 feet north of the switch. It arrived at Kalamazoo that morning on time, 7:50, and a clearance card was given it by the train dispatcher to proceed on its run. The brakeman and fireman of the train testified that it backed out from the central station about one minute late, and as usual went round the "Y," crossing the tracks of two other railroads, stopping at one of them, and coming down on defendant's main line south of Main street, where it stopped and received orders from the operator, who testified it left that point at 8:04 and, as was his duty, he entered the time upon the train entry sheet, which he produced and verified. At the Michigan Central crossing, some distance north of Main street, the towerman at the intersection of the tracks entered its passing upon his train register as 8:05. The coroner, who examined the dead body of the engineer of this train as it lay by the track after the accident, found that his watch, with the crystal broken, was jammed and had stopped, as its hands showed, at 8:06. This evidence of the exact time of the movements of No. 532 before and when the accident occurred is contradicted by the unsupported testimony of plaintiff that just after the accident he looked at his watch and found the passenger train was three minutes ahead of time, or 8:03, although inferential support is claimed in the statement of Endres, his fireman, that they left the standard switch about a half mile north of the place of the accident, where they had stopped either "just before we stopped or just before we started; * * * it was a little before 8 o'clock" by his watch. Plaintiff claims they left this point at 7:59.

Plaintiff was a man 40 years of age, experienced in railroading, familiar with the stations and tracks on the Kalamazoo division of defendant's line, having been in its employ for 14 years as fireman and engineer, running on passenger, freight, and special trains. He testified that he was familiar with the rules in force upon the road; had passed his examination for promotion as engineer in 1905; had his rule book and studied it; was well acquainted with the route he was running, its stations, sidings, and the curve where the accident occurred; knew the time schedule of the passenger train with which he collided, the course it would follow in leaving Kalamazoo north-bound; that it would ordinarily pass through the north yards without stopping if on time or behind time; and that his own train was an inferior train which by rule was required to look out for and keep out of the way of that train, and at meeting points "take the siding and clear the superior train at least five minutes, and must pull into the siding when practicable." He also testified that the engineer of the passenger train who was killed had more experience as an engineer than himself.

The gravel train upon which plaintiff was engineer was over 690 feet long, consisting of 14 cars loaded with gravel, a car carrying what is called a "plow" for unloading them, a caboose and engine. The crew was composed of the conductor, engineer, fireman, and two brakemen. It left Grand Rapids for Three Rivers that morning at 5:30 and later than usual, starting under the following order to the engineer: "Engine 5761 will run extra Wentworth to Three Rivers." At Otsego plaintiff had received an order that "Extra 5761 will meet 532 at north yards Kalamazoo," and proceeded to Plainwell, 12 miles north of Kalamazoo, where water was taken and machinery oiled. Plaintiff there sent the brakeman to the operator to learn

188 Mich.—39.

if the passenger was late and ask if they could give him an order for that train. The operator communicated with the train dispatcher and replied that 532 was on time and he could give them no orders against it, stating the dispatcher wanted to know if they had time to make Cooper without an order. The brakeman, looking at his watch, said they had. He testified that he reported to plaintiff what the operator said and asked about making Cooper, and his own reply to the inquiry. Plaintiff testified that the brakeman reported that 532 was on time, and the dispatcher would give them no order against it, from which he knew he had to look out for the time and schedule of the passenger train, but that nothing was reported as to a conversation about Cooper. Cooper was a station between Plainwell and Kalamazoo, about 5½ miles from defendant's north yards in the latter city. They left Plainwell at 7:40, the brakeman riding in the engine cab. Plaintiff was running fast, at times over 50 miles an hour, and did not slacken his train or stop at Cooper. Having expected him to do so, the brakeman then looked at his watch, and the fireman, sitting near him, also looked. Both testify it was 7:55. The brakeman asked plaintiff if he was going to stop, and, receiving a reply that they had time to make the Standard Paper Company switch at Kalamazoo, told him they were on short time and taking a chance while the fireman expressed his misgivings by shaking his head at plaintiff, who states that he did not hear or see these warnings. Plaintiff stopped at the paper mill switch with a view, as he states, to heading in on that siding, but on receiving a signal from the conductor at the rear of the train went on. He testifies it was then 7:59. In reply to a suggestion of his fireman they had better stop there, he said they were all right and started on, putting the brakeman on the pilot of the engine with a flag. The siding he left was a private,

industrial side track, not recognized by dispatchers for passing trains, though sometimes used in an emergency by those operating trains. The signal from the rear afforded plaintiff no excuse or justification for proceeding in violation of any rule. He admitted that the engineer is responsible for seeing that the head of the train is protected, without instructions, and that he was familiar with the rule which provides as follows:

"The engineman is jointly and equally responsible with the conductor for the safety of his train and movement of the same in strict compliance with the rule, and he must decline to obey any order which involves peril to his train or violation of the rules."

From where he started to the curve was about 1,500 feet and the length of this double curve upon which he then entered was 1,650 feet. The effect of this curve places the main track proceeding south from it over 500 feet farther to the west than the main track running from the north end of the curve; the general direction of the curve being southwest and northeast. Familiar with these conditions, knowing the obstructions which the reverse curve presented to a view along the track, informed that the passenger train, which had the right of way, was then on time and had left the Kalamazoo central station, he started his heavy gravel extra towards it and entered the curve running, as he estimates, at 10 miles an hour. He met it on the curve. Assuming, as he testifies, that the collision occurred at 8:03 and 532 was ahead of schedule time, of which the trial court held "there was some slight evidence" for the jury, plaintiff was yet palpably proceeding in violation of the rules which he carried in his pocket and was familiar with, containing the admonition:

"Obedience to the rules is essential to the safety of

passengers and employees, and to the protection of property."

He knew the approaching passenger train was due to pass the north yard switch just ahead of him at 8:05 and the rules required him to have his long and heavy train side-tracked and clear at least five minutes before it passed or, if that became impracticable, to guard his train with a flagman a sufficient distance ahead to insure full protection.

It is obvious that this collision can be attributed to no one but the engineers of those trains—one or both. Plaintiff alleges in his declaration and claims that he was free from negligence, and as a ground of recovering damages in this case lays the blame upon the dead engineer, charging him with running his train ahead of time at an excessive rate of speed, and failing to discover plaintiff's train as early as he might and take action sooner to stop his own. While upon these propositions there is supporting evidence which might not justify the court in disposing of all of them as questions of law, it was, as a whole, strongly contradicted by undisputed evidential facts and the testimony of witnesses in a position to know; and, as bearing upon the deceased's negligence, such evidence should be considered in connection with the fact that he had just received a clearance card to proceed on his run, with a superior train, practically on time, with no intimation of there being an extra train approaching; that he owed no special duty to anticipate or look out for plaintiff at that time or place, but, on the contrary, had reason, and the right, to assume that any inferior extra train which might be using the track to the north of him would clear upon a siding within the rule time or, at least, protect itself by a flagman sent ahead sufficient distance for safety.

The trial court refused defendant's request to charge the jury as a matter of law that plaintiff was

guilty of negligence contributing to the accident, and submitted that question to them as an issue of fact, charging that:

"The burden of proof is on the defendant to show how much the damages are diminished by reason of the contributory negligence of the plaintiff.   *   *   * If you find that plaintiff is entitled to recover, but that he was not guilty of any contributory negligence which contributed in any degree to the injury, he would be entitled to full damages."

The court further instructed the jury as to the general rule for measure of damages in personal injury cases, told them if they found for plaintiff they should first determine his full damages which should be the amount of their verdict, "unless the plaintiff was guilty of contributory negligence," in which case the amount of damages resulting from his own negligence should be subtracted from the total and the damages should be "apportioned according to the relative faults or negligence of the parties," thus in effect instructing the jury that if any negligence on the part of defendant appeared, a verdict must be rendered in favor of plaintiff for the full measure of all damages sustained by him, irrespective of what his own evidence disclosed, unless, assuming the burden of proof as to contributory negligence, defendant showed how much plaintiff's damages were diminished by reason thereof.

The Federal statute under which this action is laid provides, as does Act No. 104, Pub. Acts 1909 of this State, that the fact an employee may have been guilty of contributory negligence shall not bar a recovery. The pertinent portion of the Federal act is as follows (35 U. S. Stat. 66, volume 4, U. S. Comp. Stat. 1913, § 8659) :

"In all actions hereafter brought against any such common carrier by railroad under or by virtue of any of the provisions of this act to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, the fact that the

employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee."

This modifies, as does our own statute, the common-law rule formerly applied in this jurisdiction that recovery cannot be had for injuries resulting from another's negligence, if negligence of the person injured was a contributing cause.

Though at one time questioned, the right and duty of State courts to accept jurisdiction and enforce this Federal act, when their jurisdiction as prescribed by local laws is adequate, was settled affirmatively in *Mondou* v. *Railroad Co.,* 223 U. S. 1 (32 Sup. Ct. 169, 38 L. R. A. [N. S.] 44).

The Federal courts hold that the burden of proving contributory negligence is on the defendant, that the rule is beyond mere matters of State procedure and in administering this act the State courts must follow the Federal rule. *Central Vermont R. Co.* v. *White,* 238 U. S. 508 (35 Sup. Ct. 865).

Plaintiff has alleged in his declaration that he was "without fault or negligence on his part"; but, assuming that under the Federal rule this is surplusage and he was not required to prove such allegation, and, accepting the rule in all its aspects, we do not understand the Federal courts have ever held that where plaintiff's negligence is established by his own evidence, the defendant could not have the benefit of it. The *onus probandi* as to defendant begins with the condition of affairs as it stands upon the undisputed facts as plaintiff's testimony leaves them. Here any presumption of law that plaintiff was not in fault which might otherwise obtain was overthrown by his own evidence, and it is clearly disclosed by the undisputed facts that plaintiff was guilty of such negligence causing or contributing to the accident as would, at common law,

have entirely barred recovery. That plaintiff was violating well-known rules of his company when this accident occurred is conclusively shown. He was, as a matter of law, guilty of negligence, and the court should have so instructed the jury before submitting to them the questions of defendant's negligence and apportionment of damages. The following reflections upon that subject from the majority opinion in *Jones* v. *Railway Co.*, 168 Mich. 1 (133 N. W. 993), are, in many respects, applicable to the facts presented here:

"The law requires the making of regulations and rules by railroads. It punishes men who disobey them by fine and imprisonment. It is a startling proposition to men who travel on railroads that a regulation requiring engineers to observe the common rule of the road and keep to the right track may be disobeyed with impunity whenever an employee may have reason to think a particular train will not run; and not only that, but, after causing the death of one, painful injury to several, and wrecking his employer's property and subjecting it to the payment of damages to its passengers, he may still sue the employer and recover large damages upon the theory that his criminal disobedience was invited by reason of the employer's failure to anticipate and provide against it by taking him into its confidence, to the general demoralization of its business. Railroading is a matter of minutes and seconds. * * * Great care is taken to protect the public against the consequences of disobedience or mistake. The rules do not permit an engineer to go unprotected on the time of a regular train, even though he has reason to believe it will not run. He is still required to protect against accident by obeying the rule, and it is made criminal to do otherwise. Written rules of railroad companies cannot be treated as abrogated by such railroad companies on testimony tending to show nothing more substantial than insubordinate and unreported criminal disobedience on the part of some of the employees. This is simply a case of 'taking a chance,' whereby many others 'were made to take chances.' "

The amount of the verdict in this case indicates that the jury did not diminish the damages "in proportion to the amount of negligence attributable to such employee," and in that aspect of the case it was clearly excessive.

Although the errors pointed out necessitate a reversal, as the case is not finally disposed of here, it is perhaps proper to state this court is unable to acquiesce in defendant's contention that the trial court should have dismissed the case for want of jurisdiction because plaintiff was not shown to have been engaged in interstate commerce at the time of the accident. It is undisputed that defendant's line extends into other States, and that it is regularly engaged in transporting interstate merchandise over its lines. Plaintiff's train was engaged in hauling gravel for use in repairing or improving the roadbed over which interstate commerce regularly passed. While there is unusual conflict and contradiction in both the State and Federal authorities upon the question of when an employee of an interstate commerce road is or is not working under the provisions of the act, and even upon this direct question of track repair or improvements, it must be conceded the Federal authorities are controlling. The greatest number and latest decisions from that source have, we think, made a distinction between rolling stock, tools, and other appliances of a railroad which may or may not be used in its interstate service and its tracks, and settled the proposition that track maintenance or repairs not only facilitate, but are imperatively necessary to, all interstate commerce passing over the line; and the work of one engaged in such repairs is so directly connected and immediately beneficial to all commerce which uses the road that he must be regarded as covered by the act. *Pederson* v. *Railroad Co.*, 229 U. S. 146 (33 Sup. Ct. 648, Am. & Eng. Ann. Cas. 1914C, 153) ; *Zikos*

v. *Railroad & Navigation Co.* (C. C.), 179 Fed. 893;
*Thomson* v. *Railroad Co.* (D. C.), 205 Fed. 203;
*Tralich* v. *Railway Co.* (D. C.), 217 Fed. 675. In the
latter case plaintiff was working on a steam shovel
engaged in removing earth from the tracks and road-
bed of a railroad which carried interstate merchandise.

For the reasons previously stated, the judgment is
reversed and a new trial granted.

KUHN, STONE, BIRD, and MOORE, JJ., concurred with
STEERE, J.

OSTRANDER, J.  I think there is no testimony of any
negligence of the defendant causing or contributing
to the injury.

BROOKE, C. J., concurred with OSTRANDER, J.

The late Justice McALVAY took no part in this de-
cision.