[No. 21706.   Department Two.   August 8, 1929.]

W. H. PRINK, *Respondent*, v. LONGVIEW, PORTLAND & NORTHERN RAILWAY COMPANY, *Appellant.*[1]

[1]Reported in 279. Pac. 1115.

*Ellis & Evans* and *Chas. H. Paul,* for appellant.

*Gus. L. Thacker* and *Mallery & Hallin,* for respondent.

PARKER, J.—The plaintiff Prink seeks recovery of damages for personal injuries suffered by him, alleged as the result of the negligence of his employer, the defendant railway company, while obeying a command of its foreman under whom he was working. Trial upon the merits in the superior court for Cowlitz county, sitting with a jury, resulted in a verdict and judgment in favor of Prink, from which the railway company has appealed to this court. The two main questions with reference to which it is necessary to state the facts of the case in some detail are: First, as to whether Prink's employment was so intimately related to interstate commerce as to make his claim for damages determinable by a civil action in the superior court against the railway company, or by resort to rights given to employees under our workmen's compensation act; and, second, as to whether or not he assumed the risk of his act culminating in his injury.

The jury were warranted in believing, and manifestly did believe from the evidence, the main controlling facts to be in substance as follows: The railway company, at the time Prink was injured and for some three years prior thereto, was engaged in interstate commerce; that is, it had completed and was

during that period operating trains carrying interstate as well as intrastate shipments over its main line track in the immediate neighborhood of where Prink was employed at the time he was injured. The company's main line track, running northerly near the town of Castle Rock, in Cowlitz county, was located and constructed across a bend of the Cowlitz river, twice crossing the main channel of the river over trestles, within a distance of one mile, the river there flowing westerly, southerly and easterly.

A very short distance east of the main line track, there was, at the time of its construction, a channel through which a small portion of the river flowed, especially when the water was high, creating what was regarded and referred to in the neighborhood as an island in the bend of the main channel, though this so-called island was, seemingly, not always surrounded by water. The original plan of the company, in connection with the construction of its main line track, was to convert this easterly minor channel of the river into the main channel, to the end that ultimately the two trestles supporting the main line crossings would be entirely freed from the hazard incident to such crossings.

To that end, the company commenced the deepening and widening of the easterly channel, carrying on that work, we shall assume, practically continuously for some three years up to the time Prink was injured. The material so excavated from that channel was used in building and strengthening a dike along its western bank and east of the main line track. The material was also used in extending the dike across the main channel of the river looking to the diverting of all the water through the easterly channel. The evidence does not, however, render it plain as to just how far in this latter respect the work had progressed. The material

so excavated was also used, to some extent, as ballast along the already constructed main line track. It was being so used, at least to a considerable extent, very near the time that Prink was injured, though probably not on that very day.

The excavation of the easterly channel was carried on by a steam shovel and a so-called drag line, oil being used for steam power fuel. A switch track was constructed east of the main track, running northerly along the dike for a distance of nearly a half mile from a point just north of the southerly main channel crossing of the main line track. The steam shovel, and also a work train for hauling the material away, such as was used elsewhere, ran upon this switch. The fuel oil was brought there in an oil tank railway car and placed upon a short spur off the main switch a short distance north of where it left the main line track.

It was not practical to place this oil tank car accessible to the steam shovel so that oil could be transferred directly from it to the steam shovel, so Prink was employed as a teamster to haul the oil with a team of horses and a wagon oil tank from the oil tank car to the steam shovel, wherever it might be at work along the dike and switch. The road conditions for such hauling were changing from time to time by reason of the deposit of material from the channel excavation along the dike and switch, though some effort was made in the operation of the steam shovel to keep the surface as smooth as possible. Aside from this effort, Prink was required, in his employment, to further make his own road for reaching the steam shovel. This it was practical for him to do only along and very close to the end of the ties of the switch; that is, so close that he could not drive past any railway engine or cars while standing on the switch. He had his road

so located in suitable and safe condition for hauling oil to the steam shovel, and, up until the time he was injured, he always freely drove along his road in safety, near the end of the ties of the switch to the steam shovel, for delivering oil there when no engine or cars were on the switch. He was given to understand by the foreman that he would have the right of way there over work trains coming onto the switch, it being very necessary that the oil fuel supply be not interfered with.

Toward the close of the working hours of the day he was injured, Prink had filled his wagon tank from the oil tank car and delivered his load to the steam shovel. While there, a work train, consisting of an engine, tender and a few cars, backed in upon the switch so that it was not possible for him to drive out along his prepared road while the work train was upon the switch. The surface immediately outside his road opposite the train was very rough and hazardous to drive over, though apparently not impossible to drive over. It was not only very rough, but somewhat higher than the road. He asked the trainmen to move the train out while he could drive out. This would have taken but a few minutes. They refused to move the train. He then appealed to the foreman directly in charge of the work. As to what was then said and done, he testified in part as follows:

"I had orders to follow up the steam shovel and refill my wagon with surplus to have on hand and let them take the oil car to Longview and get it filled up before Monday morning, and I had to fill up the steam shovel and drive back, and there was no train in there at all. They had pulled out. I drove in when they were out and before I got unloaded they backed in and stopped right on my roadway, and I wanted them to pull up and the brakeman said he was not going to pull up. I turned to the foreman and said, 'Have them pull

the train off.' He said to 'get it all in, unload the car [meaning the tank car] so they can get that car to Longview tonight.' He said, 'There is lots of room in there,' and to 'go on.' I thought he knew more about it than I did.''

While Prink and the foreman possessed the same degree of knowledge about the condition of the road and of the ground immediately outside of it opposite the switch track, Prink, manifestly regarding this direction of the foreman as peremptory and emergent, because of the necessity of taking the oil tank away at the end of the work day, which was then very near, attempted to drive past the train. In doing so, he drove partially off his road, and, exercising care as best he could under the circumstances, the wagon tipped over and fell against the tender of the engine. In the fall he was thrown from his seat on the wagon and received the injuries for which he here seeks and was awarded recovery.

While there seems to be no serious dispute but that the railway company had been engaged in interstate as well as intrastate commerce in the operation of its main line track since its original construction, it is contended for the company that the work in which Prink was engaged, in connection with the changing of the channel of the river, was "railroad construction work," as distinguished from "maintenance," and hence was under our workmen's compensation act. In that behalf, the following language of that act is invoked:

''Section 18. Inasmuch as it has proved impossible in the case of employees of common carriers by railroad, engaged in maintenance and operation of railways doing interstate, foreign and intrastate commerce, and in maintenance and construction of their equipment, to separate and distinguish the connection of such employees with interstate or foreign commerce

from their connection with intrastate commerce, and such employees have, in fact, received no compensation under this act, the provisions of this act shall not apply to work performed by such employees in the maintenance and operation of such railroads or performed in the maintenance or construction of their equipment, or to the employees of such common carriers by railroad engaged therein, but nothing herein shall be construed as excluding from the operation of this act railroad construction work, or the employees engaged thereon.'' Laws of 1925, Ex. Ses., p. 98, § 1 (Rem. 1927 Sup., § 7693).

We are to remember that the work in which Prink was employed, in changing the main channel of the river, was being carried on some three years after the completion and putting in operation of the company's main line track; also that the work was not in connection with the construction of any other track. Plainly, the work had to do only with the protection and maintenance of the main line track. In *Pedersen v. Delaware, L. & W. R. Co.*, 229 U. S. 146, the injured plaintiff was employed in carrying to a bridge some bolts to be used in the repair of a railway bridge by taking out a girder and inserting a new one, the bridge being used in both interstate and intrastate commerce. Holding that the plaintiff was employed in interstate commerce, Mr. Justice Van Devanter, speaking for the court, said:

''Was that work being done independently of the interstate commerce in which the defendant was engaged, or was it so closely connected therewith as to be a part of it? Was its performance a matter of indifference so far as that commerce was concerned, or was it in the nature of a duty resting upon the carrier? The answers are obvious. Tracks and bridges are as indispensable to interstate commerce by railroad as are engines and cars, and sound economic reasons unite with settled rules of law in demanding that all of these instrumentalities be kept in repair. The security, expedition and efficiency of the commerce depends in large

measure upon this being done. Indeed, the statute now before us proceeds upon the theory that the carrier is charged with the duty of exercising appropriate care to prevent or correct 'any defect or insufficiency . . . in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment' used in interstate commerce. But independently of the statute, we are of opinion that the work of keeping such instrumentalities in a proper state of repair while thus used is so closely related to such commerce as to be in practice and in legal contemplation a part of it. The contention to the contrary proceeds upon the assumption that interstate commerce by railroad can be separated into its several elements and the nature of each determined regardless of its relation to others or to the business as a whole. But this is an erroneous assumption. The true test always is: Is the work in question a part of the interstate commerce in which the carrier is engaged? See *McCall v. California,* 136 U. S. 104, 109, 111; *Second Employers' Liability Cases,* 223 U. S. 1, 6, 59; *Zikos v. Oregon R. & Navigation Co.,* 179 Fed. Rep. 893, 897, 898; *Central R. Co. of N. J. v. Colasurdo,* 192 Fed. Rep. 901; *Darr v. Baltimore & O. R. Co.,* 197 Fed. Rep. 665; *Northern Pacific Ry. Co. v. Maerkl,* 198 Fed. Rep. 1. Of course, we are not here concerned with the construction of tracks, bridges, engines or cars which have not as yet become instrumentalities in such commerce, but only with the work of maintaining them in proper condition after they have become such instrumentalities and during their use as such.''

We see no difference in principle in that case from this. The differences we see consist only in a work of larger physical character in this case. The fact remains that it was work looking only to the protection and maintenance of the company's existing main line track which was then, and long prior thereto had become, an instrumentality of interstate commerce. In any event, the jury had the right to so decide as a question of fact, and it could not be decided otherwise as a question of law in this case. The following, and many

other cases which could be cited, lend support to this view: *North Carolina R. Co. v. Zachary,* 232 U. S. 248; *Tralich v. Chicago, M. & St. P. R. Co.,* 217 Fed. 675; *Holmberg v. Lake Shore & M. S. R. Co.,* 188 Mich. 605, 155 N. W. 504; *Louisville & N. R. Co. v. Blankenship,* 199 Ala. 521, 74 South. 960. This case is quite different from construction of new track as a cut-off of substantial moment, not yet in use, as was in question in *Bravis v. Chicago, M. & St. P. R. Co.,* 217 Fed. 234. We conclude that Prink's remedy for whatever relief he is entitled to is by civil action in court, and not under our workmen's compensation law.

■ It is contended that Prink assumed the risk of driving alongside the work train, partially off his road, in view of his knowledge of conditions there existing. We think it cannot be so decided as a matter of law. We have noticed that, while Prink was well informed as to those conditions, the foreman in direct charge of the work was equally well informed as to those conditions. Prink drove alongside the train in compliance with the foreman's express direction of a peremptory nature. We think the danger was not so apparent that it can be decided as a matter of law that Prink assumed the risk in proceeding in obedience to the command of the foreman. That, we think, was a jury question. Our decision in *Christiansen v. McLellan,* 74 Wash. 318, 133 Pac. 434, we think, is decisive of this question. We there said:

"The third contention is that the respondent assumed the risk of injury from driving down the embankment, but we think this was a question for the jury. True, the slope was steep, and was obvious to the respondent, but the order of the master directing him to drive thereover contained the implied assurance that it was a reasonably safe thing to do, and the mistake in judgment is the mistake of the master, unless the danger was so plain and apparent that there could

be no two opinions concerning it, and whether or not it was so was for the jury. *Anustasakas v. International Contract Co.,* 57 Wash. 453, 107 Pac. 342; *Johnson v. Collier,* 54 Wash. 478, 103 Pac. 818; *Hilgar v. Walla Walla,* 50 Wash. 470, 97 Pac. 498, 19 L. R. A. (N. S.) 367; *Parr v. Spokane,* 67 Wash. 164, 121 Pac. 453; *Fueston v. Langan,* 67 Wash. 212, 121 Pac. 55; *Knudsen v. Moe Brothers,* 66 Wash. 118, 119 Pac. 27.''

The following of our later decisions are in harmony with this holding: *Magnuson v. MacAdam,* 77 Wash. 289, 137 Pac. 485; *Walters v. Sievers,* 107 Wash. 221, 181 Pac. 853; *Long v. Shirrod,* 128 Wash. 258, 222 Pac. 482.

It is true, as suggested by counsel for the company, that conditions attending the work were of a changing character during its progress. It is also true that, where conditions are changing by reason of the inherent nature of the work, the rule of safe place to work is limited in its application. However, in this case Prink had a safe road to drive over and had been permitted to use it, wholly unobstructed. The road being in this condition, the foreman ordered Prink to drive over ground that was unsafe, without allowing him any time to make a safe way over such ground. This, we think, prevents the changing conditions of the work being available to the company in support of contention made in its behalf that Prink assumed the risk.

Contention is made in behalf of the company that the trial court erred to its prejudice by refusing, at the beginning of the trial, to require counsel for Prink to elect as to whether they would proceed, seeking recovery ''under the Federal liability statute or under the common law.'' We think our decision in *Archibald v. Northern Pac. R. Co.,* 108 Wash. 97, 183 Pac. 95, is decisive against this contention. It is conceded that the pleadings and the court's instructions to the jury were correct and applicable, in the alternative,

to both of these theories of recovery, if it be held that counsel for Prink had the right to have the case so proceed. We conclude that he was not required to elect as between these theories of claimed recovery.

Some other contentions are made in behalf of the company and briefly presented to us. We think it sufficient to say that we regard them without merit.

The judgment is affirmed.

FULLERTON, MAIN, MILLARD, and FRENCH, JJ., concur.