Kansas City Southern Railway Company v. Leinen.

Opinion delivered June 14, 1920.

1. Commerce — Employee engaged in interstate commerce.—A brakeman employed on a train hauling ballast to be used on the main track of an interstate carrier, was engaged in interstate commerce, and the Federal Employer's Liability Act (U. S. Comp. Stat., §§ 8657-8665) applied in an action for personal injuries.

2. Master and servant—Negligence in stopping train.—In an action by a brakeman for injuries received when the train made an emergency stop, evidence held to make a case for the jury.

3. Appeal and error—Conflicting instructions—Harmless error.—Where there were a general verdict and four special verdicts in a negligence case, and the jury specifically found against de-

fendant on a number of allegations of negligence, defendant was not prejudiced by a conflict in the instructions relating to one of the allegations of negligence, as a finding upon the other allegations was sufficient to support the general finding of liability.

4. TRIAL—SPECIAL FINDING AND GENERAL VERDICT.—Under Kirby's Digest, § 6208, where a special finding of fact is inconsistent with the general verdict, the former controls the latter, and the court may give judgment accordingly.

5. APPEAL AND ERROR—HARMLESS ERROR.—In a personal injury case, where the jury made specific findings against the defendant on several allegations of negligence, defendant can not complain of a judgment in favor of plaintiff if there was sufficient evidence to sustain any one of the findings.

6. DAMAGES—PERSONAL INJURIES—EXCESSIVENESS.—Where plaintiff, a brakeman 28 years old, earning $100 per month and in line for promotion, received permanent injuries consisting of a crushed skull, his kidneys, eyesight and sexual powers being affected, rendering him unable to perform labor of any kind or to enjoy any outdoors sports, a verdict of $53,333 was excessive and will be reduced to $35,000.

7. APPEAL AND ERROR—REDUCTION OF VERDICT.—The Supreme Court, on appeal by defendant in an action under the Federal Employer's Liability Act (U. S. Comp. Stat., §§ 8657-8665) is authorized to reduce a verdict as in any other case if it finds it excessive.

Appeal from Little River Circuit Court; *James S. Steel,* Judge; modified and affirmed.

*F. H. Moore, J. R. Bell* and *J. B. McDonough,* for appellant; *S. W. Moore,* of counsel.

1. Plaintiff at the time of his injury was not engaged in interstate commerce, and hence not entitled to recover under the Federal Employer's Liability Act, and the judgment based on that act should be reversed. 232 U. S. 248; 218 Fed. 748; 233 U. S. 473; 241 *Id.* 177; 238 Fed. 95; 253 *Id.* 736; 261 *Id.* 760; 159 N. W. 14; 157 *Id.* 616; 154 *Id.* 516.

2. The negligence charged was not proved, and the peremptory instruction requested by defendant should have been given. In the absence of an unusally violent stop, there is no negligence. The employee assumes the risk. 269 Mo. 464; 165 *Id.* 612; 195 *Id.* 105; 259 *Id.* 109;

130 *Id.* 132; 93 Mo. App. 289; 98 *Id.* 494; 272 Mo. 350. This accident happened in Missouri, and the decisions of that State are in point. See, also, 93 N. E. 575. The injury was an accident, purely, and there was no negligence. 98 Mo. App. 494, 502. The proximate cause, ordinarily, is a question for the jury. 86 Ark. 289; 110 S. W. 1037; 69 Ark. 402; 64 S. W. 226; 29 Sup. Ct. Rep. 321.

3. The court erred in giving plaintiff's instruction No. 1. It is not supported by any evidence. 87 Ark. 243; 88 *Id.* 594; 86 *Id.* 91; 85 *Id.* 390; 77 *Id.* 567. It conflicts with other instructions properly given. 84 Ark. 233; 72 *Id.* 440; 76 *Id.* 69.

4. The court erred in giving instruction No. 2½ for plaintiff. 135 Mo. 414. Plaintiff was barred by contributory negilgence. 2 Cyc. 507 and note 47; 240 U. S. 444; 36 Sup. Ct. Rep. 406; 162 Mo. 463; 38 Cyc. 1608, note 1608. The instruction is ambiguous and misleading. 229 U. S. 114; 63 Ark. 477.

5. It was error to give instruction No. 3 for plaintiff. 63 Ark. 477; 39 S. W. 359; 55 Ark. 588; 119 *Id.* 295.

6. It was error to give No. 6 for plaintiff. 241 U. S. 229.

7. It was error to give instruction No. 7 for plaintiff. 96 Ark. 614; 150 S. W. 863.

8. The court erred in admitting certain depositions taken by plaintiff. See Bellus and Long, 32 S. E. 266.

9. The judgment is grossly excessive. 241 U. S. 485, 494; 100 Ark. 107; 114 *Id.* 224; 118 *Id.* 49; 105 *Id.* 533.

10. A remittitur will not cure the error, and the judgment should be reversed. 184 S. W. 1051; 161 U. S. 397; 158 *Id.* 41-53; 91 *Id.* 646-656; 91 N. E. 431; 141 Mo. App. 453.

*A. D. Dulaney, Chas. Stephens* and *John H. Curran,* for appellee.

1. This case comes within the provisions of the Federal Employers' Liability Act. 1 Roberts, Fed.

Empl. Act, p. 847; 201 S. W. 128; 124 C. C. A. 565; 204 Fed. 751; 196 U. S. 1; 229 *Id.* 146; 33 Sup. Ct. Rep. 648; 238 U. S. 439; 155 N. W. 504; 129 Ark. 211, etc.

2.  There was no error in the instructions given for plaintiff.  97 Ark. 198; 98 *Id.* 227; 88 *Id.* 233; 115 S. W. 175; 67 *Id.* 594; 62 *Id.* 65; 86 Ark. 76; 77 *Id.* 458.  The verdict and judgment are right on the whole case, even if there was slight error in the instructions.  142 Ark. 302; 143 S. W. 106; 113 Ark. 380; 85 *Id.* 127; 97 *Id.* 576. No specific objections were made to the instructions; the objections were general.  96 Ark. 531.  Proper instructions should have been suggested and offered to the court.  61 Ark. 613.

3.  The verdict is not excessive.  79 Ark. 137; 137 S. W. 1109.  But, if so, a remittitur will cure this, the only error.  15 Ark. 345; 127 *Id.* 429; 3 Am. Law Rep. Anno. 605; 183 Ala. 138; 62 So. 679; 5 Ga. App. 402; 63 S. E. 299; 121 N. W. 186; 46 So. Rep. 929; 39 L. R. A. (N. S.) 202; 130 La. 66; 67 Minn. 260; 1 Am. Negl. Rep. 93; 167 S. W. 656; 13 Hun (N. Y.) 4; 103 Kan. 655.

4.  The jury have passed on the amount of damages, and the evidence sustains the verdict and is conclusive. 184 S. W. 1957; 141 Mo. App. 453.

SMITH, J.  Appellee, plaintiff below, brought this suit to recover damages on account of injuries received by him while employed as a brakeman by appellant railway company near Joplin, in the State of Missouri. There was a verdict and judgment in his favor for $53,-333, and this appeal is from that judgment.

The train on which appellee was employed at the time of his injury consisted of an engine and a caboose and about sixteen empty Rogers ballast cars, which were being transported from Lanagan, Missouri, to Webb City, Missouri.  This train with its crew had for some weeks been engaged in transporting ballast from Webb City to points on appellant's railway in southwest Missouri, and in transporting the empty ballast cars back to the chat

piles in order that they might again be loaded with the chats, which were being used for ballast.

The train crew consisted of the following men. Murphy, the engineer; Hazen, the fireman; Harriman, a brakeman; Hayes, the conductor, and appellee, another brakeman. The train was exclusively employed in hauling and distributing the ballast on the main line of appellant's railway. On arriving at the place where the ballasting was being done, the chats were allowed to run out of the middle of the hopper-shaped cars which were being used on to the tracks while the train moved along at the rate of about two and one-half miles per hour. The method employed resulted in actually distributing the chats between the rails, and a part of every train load was unloaded on the main line of the railroad over which interstate trains ran. This point is of importance because appellee elected to rely upon the count of his complaint in which he alleged that he was within the provisions of the Federal Employers' Liability Act at the time of his injury.

The negligence complained of is indicated by the interrogatories submitted to the jury and the answers returned thereon.

"Do you find from a preponderance of the evidence that Engineer Murphy was guilty of negligence in not keeping a proper lookout and thereby failing to observe the first signal given by Harriman?

"Answer: He was guilty.

"Was Harriman negligent in not using the conductor's brake valve in the cupola of the caboose after he had failed for two or three signals to get the engineer to respond?

"Answer: He was guilty.

"Was Hayes, under all the surrounding circumstances, negligent in saying to Leinen what caused Leinen to start back on to the car when he said Hayes knew that the danger of a stop still existed?

"Answer: He was guilty.

"1.   State upon what act or acts of negligence you base your verdict?

"1.   We, the jury, base our verdict on the negligence of the Engineer, Murphy, in not keeping the proper look-out and applying the emergency brake at the proper time.

"2.   The negligence of Brakeman Harriman in not applying conductor's brake valve after giving the third signal to Engineer Murphy.

"3.   Also the negligence of Conductor Hayes in saying, come back Nick, everything is all right, before countermanding the emergency signal.

"Frank Williams, Foreman."

At the time of the injury the train was moving north from Joplin to Webb City, Missouri. The engine was at the rear of the train and was backing up, which would put the engineer on the west side of the engine and the fireman on the east side. The caboose was next to the engine, and the cars were in front of the caboose. The brakeman, Harriman, was in the cupola of the caboose for the purpose of passing signals from the head-end of the train to the engineer. Conductor Hayes and appellee were on the front end of the head car in the direction in which the train was moving for the purpose of keeping the lookout and of passing signals back to brakeman Harriman, for transmission to the engineer.

As the train was passing through a cut and was approaching a private road crossing, appellee and the conductor saw the heads of a team of horses approaching the track from the east along this private road. There was a four per cent. curve in the road at that point, which made it impossible for the engineer to see the front end of the train. When first observed, the team was, according to appellee, between 250 and 275 feet and, according to Hayes, the conductor, from 160 to 240 feet, away, and the train was moving at the rate of ten miles per hour. A number of witnesses testified as to the distance and time within which the train could have been stopped after the emergency signal was given. When the team was first observed, it appeared certain that the train would

strike it if it attempted to go upon the track, as it was apparently about to do, and appellee himself gave the emergency stop signal. This. emergency signal, which is also called a washout signal, is given by elevating the arm and allowing it to fall rapidly to the side. The conductor and appellee yelled at the driver of the team and attracted his attention to the impending danger just in time to avert it. But, after giving the washout signal for the emergency stop, in order to avoid being injured in case the train collided with the team and wagon, the conductor got up on the east side of the head car in order to be able to get off the train if the collision could not be avoided, and the appellee crossed over to the west side of the car and got down by means of the hand-holds with his foot on the stirrup or lower step in order that he could get off in case the collision occurred. Hayes could see that the team had stopped; but appellee could not, and as soon as Hayes saw there would be no collision he called to appellee. Hayes testified that he called out to appellee, ''It's all right; we never hit them.'' But, according to appellee, the conductor said, ''It's all right, Nick; come on up.'' Testimony was offered as to the meaning of the last quoted remark in railway parlance, and, according to the testimony offered in appellee's behalf, the remark meant that the emergency signal had been annulled and that the emergency stop would not be made; and appellee testified that in reliance upon this assumption he relaxed in the vigilance he would otherwise have used, and that the emergency stop—which was made—caught him unprepared, as he was climbing back into the car, so that he was thrown violently from the car, and that his head struck against the end of a tie, inflicting the injury to compensate which this suit was brought.

It is insisted on behalf of appellant that the stop made was not an unusual one, and that brakemen must be prepared to expect emergency stops to be made at any time, and that they are, in fact, frequently made by engineers without any signal therefor being given, and

that this hazard is, therefore, one of the usual and ordinary risks of the service which appellee assumed when he accepted his employment. But this insistence leaves out of account appellee's contention that the conductor's remark misled him and caused him to be in a position of unusual danger and helplessness when the impact resulting from the emergency stop came.

It is also insisted that the testimony fails to show any negligence on the part of the engineer in failing to promptly receive and execute the signal to stop; or that brakeman Harriman was negligent in failing to promptly receive and transmit the emergency signal to the engineer. Upon this feature of the case the testimony showing the distance which the train ran after the washout signal was given, and the distance within which it could have been stopped at the speed it was moving, was relevant, as appellee insists that it shows negligence in transmitting and executing the emergency signal.

The injury occurred on the 23rd day of November, 1916, and the testimony shows that the day was pleasant and the sun was shining brightly. There was a window on each side of the cupola of the caboose, and it was necessary for Harriman, who was riding in the cupola, to raise this window before he could signal the engineer. He testified that he promptly communicated the signal to the engineer, yet the testimony shows that he could not communicate this signal without first opening the window of the cupola. The testimony also shows that there was a conductor's brake valve in the cupola of the caboose, which he might have used when he saw there would be some delay in transmitting the signal to the engineer, and the testimony shows that the train could thus have been stopped. This valve in the caboose would have applied the air to the entire train except the engine and, with this exception, would have given practically the same braking power as would have been exercised had the air been applied in the engine.

The engineer testified that a proper lookout was being kept by him and that the washout signal was promptly

responded to by an immediate application of the air. The engineer did not see the signal given by appellee on account of the curve in the track; but there appears to be no testimony imputing negligence to the engineer.

An instruction numbered 1 presented appellee's theory of the case. It reads as follows: "1. If you believe from a preponderance of the evidence that Brakeman Harriman negligently and carelessly failed to promptly transmit the emergency signal to Engineer Murphy as soon as he should, or that said Murphy negligently and carelessly failed to keep a proper lookout and see said Harriman when he transmitted the said signal, and then apply the air brakes as promptly as he should have done, or that said Harriman carelessly and negligently failed to apply the air brakes by the use of the valve in the cupola of the caboose, when he should have done so, if you find the facts so to be, or that said Hayes carelessly and negligently induced and caused said plaintiff to leave a place of safety, and carelessly and negligently caused plaintiff to believe that no emergency stop was going to be made, or that said Hayes, after he knew that said danger of the team had passed, carelessly and negligently induced plaintiff to leave a place of safety when he, said Hayes, knew that he had not recalled said signal, and knew that all danger of striking the team was passed, if you find the facts so to be, and if you further find from a preponderance of the evidence that said acts of negligence, if any, caused said train to come to a sudden, unusual and unnecessary stop at an unusual and unnecessary place, under all the facts and circumstances shown by the evidence, by reason of which plaintiff was injured, and if you further find that any one or more of said acts of negligence, if any, was in whole or in part the proximate cause of injury to the plaintiff, then you must find for plaintiff herein, and assess his damages as in these instructions directed."

Under this instruction a verdict in appellee's favor was authorized if the jury found (a) that Harriman negligently failed to promptly transmit the emergency sig-

nal; or (b) that Engineer Murphy failed to keep a proper lookout or to execute the signal after he saw it; or (c) that Harriman failed to apply the brakes by the use of the valve in the cupola when he should have done so; or (d) that Conductor Hayes negligently induced appellee to leave a place of safety by causing him to believe that no emergency stop would be made.

It is earnestly insisted that the instruction was abstract in that there was no competent nor sufficient testimony to support a finding upon any one of the issues there submitted. It is also insisted that the instruction was in conflict with instructions numbered 10 and 15 given on motion of appellant. Instruction numbered 10 told the jury that appellee "is not entitled to recover on the negligence to the effect that Hayes, the conductor, ordered the plaintiff to get back into the car." Instruction numbered 15 told the jury that appellee "is not entitled to recover by reason of the alleged negligence of Harriman in failing to repeat the signal to the engineer."

It is finally insisted that the judgment is grossly excessive, and that, if this is true, the judgment must be reversed, as this court has no power to reduce it.

The applicability of the Federal Employers' Liability Act is a close question, indeed, but we have concluded that appellee is within its provisions and was entitled to maintain his action under it.

Through the industry of counsel many cases on this subject have been collected and reviewed, all of which profess to follow and to apply the decision of the Supreme Court of the United States in the case of *Pedersen v. D. L. & W. Ry. Co.,* 229 U. S. 146, 57 L. Ed. 1125, Ann. Cas. 1914 C, 153.

In volume 1 of Roberts' Federal Liabilities of Carriers, section 470, it is said of this case that it stands as a landmark in the extension of Federal control and the elimination of State authority over railway employees.

In the discussion of the statute in the case of *Pedersen* v. *Railway Company, supra,* Mr. Justice Van Deventor, speaking for the majority of the court, said:

"Indeed, the statute now before us (Federal Employers' Liability Act) proceeds upon the theory that the carrier is charged with the duty of exercising appropriate care to prevent or correct 'any defect or insufficiency * * * in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment' used in interstate commerce. But, independently of the statute, we are of opinion that the work of keeping such instrumentalities in a proper state of repair while thus used is so closely related to such commerce as to be in practice and in legal contemplation a part of it. The contention to the contrary proceeds upon the assumption that interstate commerce by railroad can be separated into its several elements, and the nature of each determined, regardless of its relation to others or to the business as a whole. But this is an erroneous assumption. The true test always is, Is the work in question a part of the interstate commerce in which the carrier is engaged?"

In 1 Roberts' Federal Liabilities of Carriers, section 481, the law is stated as follows: "Employees engaged in assisting in moving ballast to be used in the repair of an interstate track are within the terms of the Federal act. Thus, an engineer on an extra train running between two points in the same State and containing only gravel to be used in repairing and improving a roadbed over which interstate commerce regularly passed, was employed in interstate commerce."

Authority for the statement of the law quoted is found in the case of *Holmberg* v. *Lake Shore & M. S. R. Co.*, 155 N. W. 504. That was a decision by the Supreme Court of the State of Michigan; and, while the court was not unanimous in the opinion delivered, there was no difference of opinion among the judges as to the point now under consideration. It was there said: "Plaintiff's train was engaged in hauling gravel for use in repairing or improving the roadbed over which interstate commerce regularly passed. While there is unusual conflict and contradiction in both the State and Federal au-

thorities upon the question of when an employee of an interstate commerce road is or is not working under the provisions of the act, and even upon this direct question of track repair or improvements, it must be conceded the Federal authorities are controlling. The greatest number and latest decisions from that source have, we think, made a distinction between rolling stock, tools, and other appliances of a railroad which may or may not be used in its interstate service and its tracks, and settled the proposition that track maintenance or repairs not only facilitate, but are imperatively necessary to, all interstate commerce passing over the line; and the work of one engaged in such repairs is so directly connected and immediately beneficial to all commerce which uses the road that he must be regarded as covered by the act. *Pedersen* v. *L. & W. Ry. Co.*, 229 U. S. 146, 33 Sup. Ct. 648, 57 L. Ed. 1125, Ann. Cas. 1914 C, 153; *Zikos* v. *Oregon R. & N. Co.* (C. C.), 179 Fed. 893; *Thompson* v. *Columbia & P. S. R. Co.* (D. C.), 205 Fed. 203; *Tralich* v. *Chi., Minn. & St. P. Ry. Co.* (D. C.), 217 Fed. 675.''

We are unable to agree with counsel for appellant that no case was made for the jury, and although it does appear that instructions 10 and 15, given at the request of appellant, are in conflict with instruction numbered 1, given at appellee's request, the majority of the court are of the opinion that the reversal of the judgment is not called for on that account. The majority do not hold that it was proper to have given either instruction 10 or 15; but it is the opinion of the majority that, even though they were properly given, no prejudice resulted, although they are in conflict with appellee's instruction numbered 1.

We have here both a general and four special verdicts. There is a general finding of liability, and, in addition to the finding against appellant upon the allegations of negligence covered by instructions 10 and 15, the jury has specifically found against appellant upon other allegations of negligence submitted in appellee's instruction numbered 1 and not excluded by instructions

10 and 15; and that finding is sufficient to support the general finding of liability.

By the statute it is provided that where the special finding of fact is inconsistent with the general verdict, the former controls the latter, and the court may give judgment accordingly. Kirby's Digest, sec. 6208; *Jones v. Bank of Commerce,* 131 Ark. 362.

A majority of the court reach the conclusion that there was sufficient testimony to support the submission to the jury of the question of negligence of the conductor, Hayes, and since the jury made a specific finding on that issue, which supports the judgment, all questions as to the sufficiency of the testimony in support of the allegations of negligence against the engineer and the brakeman, and to the instructions of the court on those issues, are eliminated as being nonprejudicial. It is, therefore, unnecessary, according to the view of the majority, to determine whether or not the testimony was legally sufficient to support a finding that either the engineer or brakeman was negligent, and, if so, whether or not this negligence was, in a legal sense, the proximate cause of appellee's injury.

In the opinion of Mr. Justice WOOD and the writer, this action of the court may have tended to confuse the jury, and we think it prejudicial to have given instructions which were conflicting.

It is finally insisted that the verdict is excessive, and that, if that fact appears, that error can not be cured by a remittitur, but can be cured only by the reversal of the judgment and the remand of the cause for a new trial. This contention is based upon the theory that the doctrine of comparative negligence applies in these cases, and that, as the court can not know to what extent the jury reduced the recovery on account of the contributory negligence shown by the testimony, the court can not review the jury's verdict and finding on this question except to remand if the verdict appears to be excessive.

Assuming, however, that there was no finding of contributory negligence, and that there was no diminution

of the recovery on that account, and reviewing the judgment as we would review one in which the doctrine of comparative negligence did not apply, we conclude that the verdict is excessive. In the case of *Southern Ry. Co. v. Bennett,* 233 U. S. 80, 58 L. Ed. 860, a recovery under the Federal Employers' Liability Act was affirmed by the Supreme Court of South Carolina, and, among other errors assigned, was that of the excessiveness of the verdict. But the Supreme Court of the United States disposed of that assignment by saying: "But a case of mere excess upon the evidence is a matter to be dealt with by the trial court. It does not present a question for re-examination here upon a writ of error."

It is unquestionably true that appellee sustained a very serious injury; but he has a verdict for a larger sum than has ever yet been sustained by this court. It does not appear to us that the injury in the instant case is more serious, or that the testimony supports any larger recovery, than was sustained by this court in the case of *St. L., I. M. & S. Ry. Co. v. Webster,* 99 Ark. 265, where the court, with manifest reluctance, affirmed a judgment for $35,000, but, in doing so, said that the limit in such cases had apparently been there reached.

According to the testimony, appellee, at the time of his injury, was a young man of good health and good habits, and was twenty-eight years old, with an expectancy of 36.73 years. He was a brakeman, and was earning at the time of his injury the sum of $100 per month, and was in line of promotion with an accompanying increase of salary. Since his injury the salaries of brakemen have been increased, so that appellee would have had an increase even though he had obtained no promotion; but since his injury he has been unable to perform labor of any kind. Appellee was rendered unconscious by his fall when his head struck the corner of the tie. His skull was cracked, and his life was saved only by a most delicate and skillful operation, in which the surgeon entered the brain and removed a blood clot. Since his injuries appellee's head pains him more or less,

and his right ear always buzzes and rings, and heat from a stove or from the sun increases the pain in his head, and makes him dizzy and feel like he was going to faint. He speaks slowly, and his sight is affected and impaired. His sexual powers are gone, and his kidneys act too frequently, and at times he is very irritable, and any kind of labor, either physical or mental, tires him, and increases his headaches, and makes him more nervous and irritable. He is unable to look at moving pictures for any length of time, as this makes him dizzy, and he is unable to enjoy hunting, fishing, or any other indoor or outdoor sports. His ability to sleep was also impaired, and at times he lays awake all night. His hair began to fall out in April or May, 1917, and he became partially bald.

The operating surgeon testified: "I trephined the skull at the seat of the depression, raised and took out all the crushed bone there, cut a seam in the skull, forward to, and through, the frontal bone to the frontal sinus. I cut another seam through the temple bone to the mastoid portion. I cut another seam back through the parietal bone, back through the occipital bone until I could free the brain at the base." This physician testified, and he was corroborated by six other physicians and surgeons who at various times had treated or examined appellee, that appellee's injuries were serious and permanent, and that his capacity to perform labor and earn money was destroyed. But a study of appellee's testimony makes it apparent that his mentality is not destroyed, although it is said that he thinks slowly and speaks slowly, for his answers are responsive to the questions, and it is clear from his testimony that he fully comprehended the issues being developed before the jury.

Figures are submitted in appellant's brief, which are apparently correct, showing that $22,880 would, on a 6 per cent. basis, provide $1,200 per year for 36.73 years, that being appellee's expectancy. In addition to this loss of earning capacity, there must be taken into account the probability of promotion, and the pain, suffering and

disfigurement, and the other elements of recoverable damages which have been mentioned. But when these things have been taken into account, we think an additional allowance of $12,120 would fairly compensate appellee's injury insofar as compensation can be awarded in money for an injury so deplorable, and the verdict will, therefore, be reduced to $35,000, and as no error appears except that of the excessiveness of the verdict, judgment will be entered here for that sum with interest from the date of trial.

Mr. Justice HUMPHREYS dissents from the modification.