## JAMES STAVROS v. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY.[1]

January 27, 1922.

No. 22,649.

**Railway—ash-pit workers engaged in interstate commerce.**

1. An ash-pit or cinder pit, where are dumped the ashes and cinders from engines engaged both in intrastate and interstate commerce and which is a necessary facility in the operation of the railway, is also a facility or instrumentality used in interstate commerce, so that persons engaged in cleaning out or emptying such pit should be held engaged in work in furtherance of such commerce.

**Question for jury.**

2. The evidence is *held* to make a prima facie case for the jury whether plaintiff was so engaged when hurled into the pit by a locomotive, negligently run against him, as he was about to go into it as one of a crew of men set to work to clean it out.

[1]Reported in 186 N. W. 942.

Action in the district court for Ramsey county to recover $5,250 for injuries received while in defendant's employ. The case was tried before Dickson, J., who when plaintiff rested granted defendant's motion to dismiss the action. From an order denying his motion for a new trial, plaintiff appealed. Reversed.

*Barton & Kinkead*, for appellant.

*F. W. Root & C. W. Wright*, for respondents.

HOLT, J.

Aberdeen, South Dakota, is a division point on the Chicago, Milwaukee & St. Paul Railway system, at the time hereinafter referred to, operated by Walker D. Hines as Director General of Railroads. Plaintiff had been employed for several months, prior to November 28, 1919, as a section hand, in an extra crew or gang, maintaining the tracks of said railroad near Aberdeen, and, for about one month prior to that date, in raising, repairing and installing tracks in the yard in that city. His crew did not work in the forenoon of November 28, but at about 1 o'clock in the afternoon, he and his fellows were summoned by the foreman from their bunk car in the yard to go with him to clean out the cinder or ash-pit located west of the roundhouse. Between the latter and the ash-pit is a turntable. Double tracks run over the turntable to the ash-pit. As plaintiff came within six feet of the ash-pit, and when some of his crew were already in the pit engaged at their task, a locomotive, backing in upon the pit without a lookout in front and without ringing the bell or giving any other signal, struck plaintiff from behind, hurled him into the pit and inflicted the injuries for which he sued. It was conceded that the ash-pit or cinder-pit was a part of the line of railroad owned at the time by the Chicago, Milwaukee & St. Paul Railway Company and operated by the government, and that ashes and fires from both interstate and intrastate engines were dumped therein; that all engines that stopped on the Aberdeen division engaged both in intrastate and interstate commerce, exclusively, stopped on the pit and were cleaned there. If plaintiff when injured was not engaged in interstate commerce, it was conceded there could be no recovery in this action, for then his remedy was under the state

workmen's compensation statute. When plaintiff rested, the case was dismissed, and the appeal is from the order denying a new trial.

The learned trial court came to the conclusion that cleaning out this pit was not a work connected with or related to interstate commerce. He said: "The cinders were not dumped into the pit in the course of commerce or transportation, though they may have been the result of it. But the engines were dumped and cleaned after their use in transportation or commerce was finished." This view seems to us too narrow.

Statutes and ordinary care require that ashes and cinders be not allowed to drop from the engines as they are operated along the railroad line. The ash receptacle must not allow live cinders or coal to escape and spread fire and destruction. Some convenient place must be provided for their safe dumping. Had the pit been placed at such a place that, as the engines came in attached to a train carrying interstate commerce, they would stop over the pit and have the ash-pan emptied, there could be no question but that one in or near the pit either to dump the ash container of the engine or to shovel out and clean the pit would be engaged in furthering interstate commerce. That, for the sake of convenience, this pit, designed and used for the same purpose, is placed where it is, instead of under the main line, should not make a distinction in law as to the service in which the workman is engaged while cleaning it. At least, such appears to us to be the law until otherwise determined by the Supreme Court of the United States, the final authority in all disputes concerning the application of the Federal Employers Liability Act.

The courts of Kentucky and New Jersey have reached a conclusion wholly out of harmony with that of the court below, holding that an employe engaged in cleaning or emptying an ash-pit, designed for the use and used in the manner here shown, is furthering interstate commerce. Chief Justice Gummere in Grybowski v. Erie R. Co. 88 N. J. Law, 1, 3, 95 Atl. 764, said: "The proofs show that the ash-pit was a part of the plant of the defendant company, that it was a necessary part of that plant, and that it was used both in interstate and intrastate commerce. The keeping of it clean, and thereby

maintaining its effectiveness, was required equally for both kinds of commerce, just as the keeping in repair of tracks and bridges which are used for both kinds of commerce is a necessary incident to each of them." This decision was affirmed by the unanimous vote of the court of appeals, 89 N. J. Law, 361, 98 Atl. 1085, the opinion of Chief Justice Gummere being adopted as the opinion of the court.

In Cincinnati, N. O. & T. P. Ry. Co. v. Clarke, 169 Ky. 662, 185 S. W. 94, the ash-pit, as to location and use, is set forth much the same as the evidence reveals the situation in the instant case, the court saying [pp. 667, 668]: "It was situated under one of the tracks of appellant, and was an instrumentality designed, constructed and used by the carrier for the purpose of ridding the engines used in its operations of the ashes produced by the materials used in the engines to make the power, which was necessary to propel them. It was daily and at night used for that purpose by its engines, which were engaged in interstate commerce. The pit was a useful and necessary instrumentality in the operation of its engines engaged in interstate commerce. The ashes must necessarily be taken from the engines and when dropped into the pit, the ashes must be thrown from the pit to keep it in condition and repair to do the service for which it was used and designed."

The cases of Erie R. Co. v. Collins, 253 U. S. 77, 40 Sup. Ct. 450, 64 L. ed. 790, and Erie R. Co. v. Szary, 253 U. S. 86, 40 Sup. Ct. 454, 64 L. ed. 794, seem to point to the correctness of the decisions of the two state courts above cited. In the Szary case the employe was injured while carrying ashes to an ash-pit from stoves used in drying sand in a small structure standing in the yards of the railroad company, the sand being used for engines engaged in interstate and intrastate commerce indiscriminately. The appellant, citing Chicago, B. & Q. R. Co. v. Harrington, 241 U. S. 177, 36 Sup. Ct. 517, 60 L. ed. 941; Lehigh Valley R. Co. v. Barlow, 244 U. S. 183, 37 Sup. Ct. 515, 61 L. ed. 1070; Minneapolis & St. L. R. Co. v. Winters, 242 U. S. 353, 37 Sup. Ct. 170, 61 L. ed. 358, Ann. Cas. 1918B, 54; Shanks v. Delaware, L. & W. R. Co. 239 U. S. 556, 36 Sup. Ct. 188, 60 L. ed. 436, L. R. A. 1916C, 797; Delaware, L. & W. R. Co. v. Yurk-

onis, 238 U. S. 439; 35 Sup. Ct. 902, 59 L. ed. 1397; Illinois Cent. R. Co. v. Cousins, 241 U. S. 641, 36 Sup. Ct. 446, 60 L. ed. 1216; Baltimore & O. R. Co. v. Branson, 242 U. S. 623, 37 Sup. Ct. 244, 61 L. ed. 534; and Illinois Cent. R. Co. v. Behrens, 233 U. S. 473, 34 Sup. Ct. 646, 58 L. ed. 1051, Ann. Cas. 1914C, 163, argued in this manner: "It would seem that the nearest the plaintiff came to being engaged in interstate commerce at the time of his injury was in removing ashes from a fixture. To paraphrase the language in the Shanks opinion, the connection between the fixture and the interstate transportation was remote at best, for the only function of the fixture was to convey heat to sand which was placed in storage and then used in supplying engines, some of which were used in interstate transportation. All this stove was used for was heating and drying of sand as it was moved from storage to storage and such a use cannot be said to make it an instrument of interstate commerce, as the sand which was prepared might never have been used in such commerce."

But the court answered the argument by referring to the preceding opinion in the Collins case, saying [p. 89]: "There were attempts there, and there are attempts here, to separate the duty and assign it character by intervals of time, and distinctions between the acts of service. Indeed something is attempted to be made of an omission, or an asserted omission, in the evidence, of the kind of commerce in which the last engine served was engaged. The distinctions are too artificial for acceptance. The acts of service were too intimately related and too necessary for the final purpose to be distinguished in legal character." That the ash-pit was a necessary instrumentality or facility in the furtherance of interstate transportation as carried on by defendants, is palpable. It would not function as such, unless the accumulated ashes and cinders were removed whenever filled. The act of removing the same seems to us so intimately related to and so necessary for the final purpose of facilitating and furthering interstate transportation that plaintiff should be held engaged therein at the time of his injuries.

In the court below no particular point was made of the fact that plaintiff had not actually begun shoveling out ashes when struck.

It is most vigorously urged here. It is said that while the plaintiff, in Pedersen v. Delaware, L. & W. R. Co. 229 U. S. 146, 33 Sup. Ct. 648, 57 L. ed. 1125, Ann. Cas. 1914C, 153, was held to be engaged in interstate commerce, although he had not reached the bridge he was to repair, it appeared that he was carrying material for the repair. In the Szary case supra the employe was injured when returning from carrying ashes to the pit. The work he had done characterized his then employment. And, that there is a distinction between an employe injured upon the premises of the railroad company just as he is about to start on work connected with interstate transportation, and an employe injured as he has finished such work and is leaving the premises, the latter being under the protection of the act and not the former. The one who has finished must leave and he is protected because of the work done, but the one who comes on to work may back out and never engage in interstate transportation, hence does not come within the act until he actually begins work. Illinois Cent. R. Co. v. Behrens, 233 U. S. 473, 34 Sup. Ct. 646, 58 L. ed. 1015, Ann. Cas. 1914C, 163; Louisville & N. R. Co. v. Parker, 242 U. S. 13, 37 Sup. Ct. 4, 61 L. ed. 119; and Erie R. Co. v. Welsh, 242 U. S. 303, 37 Sup. Ct. 116, 61 L. ed. 319, are cited.

The court in the last named case says of a switch-yard conductor, who sometimes moves only intrastate cars for no purpose of facilitating the movement of interstate cars, that whether or not he is engaged in interstate commerce, at the moment of receiving an injury, "depends upon whether the series of acts that he had last performed was properly to be regarded as a succession of separate tasks or as a single and indivisible task. It turns upon no interpretation of the act of Congress, but involves simply an appreciation of the testimony and admissible inferences therefrom in order to determine whether there was a question to be submitted to the jury as to the fact of employment in interstate commerce." Here, plaintiff was steadily employed upon work connected with interstate transportation, viz., repairing tracks. It is true the burden rested on plaintiff to prove that when injured he was engaged in such work. The testimony was that he was in a crew or extra gang doing such work 6 days in the week and overtime. The foreman got him on this occa-

sion from the bunk car in the yard. The inference is permissible that plaintiff's crew was at the beck and call of the director general and all the time engaged in keeping the track and transportation facilities of the railroad in proper condition, and was called for that purpose when struck.

In Erie R. Co. v. Winfield, 244 U. S. 170, 173, 37 Sup. Ct. 556, 61 L. ed. 1057, Ann. Cas. 1918B, 662, the court said of one in charge of a switch engine: "In leaving the carrier's yard at the close of his day's work the deceased was but discharging a duty of his employment. See North Caroline R. Co. v. Zachary, 232 U. S. 248, 260," [591, 593, 34 Sup. Ct. 305, 9 N. C. C. A. 109, Ann. Cas. 1914C, 159.] "Like his trip through the yard to his engine in the morning, it was a necessary incident of his day's work, and partook of the character of that work as a whole, for it was no more an incident of one part than of another. His day's work was in both interstate and intrastate commerce, and so when he was leaving the yard at the time of the injury, his employment was in both." It is to be observed that here the court regards an employe, while passing over the carrier's track to begin work in furtherance of interstate transportation, as equally under the protection of the Federal Employer's Liability Act with an employe leaving such work. In St. Louis, S. F. & T. Ry. Co. v. Seale, 229 U. S. 156, 33 Sup. Ct. 651, 57 L. ed. 1129, Ann. Cas. 1914C, 156, a yard clerk, killed on his way to check the cars on an incoming train, was held to have been engaged in interstate commerce.

Plaintiff here was not only on his way to do the work assigned, but actually at the place, and part of the crew already at work. The point that the evidence does not show that his time had begun, seems to us too technical. He was paid by the day. It is not likely that any difference would be made among the crew as to who should cast the first shovelful. No doubt each one who started out from the bunk house at one o'clock that afternoon and worked until six o'clock got a half day's pay. So would plaintiff, had he not been hurled into the pit. The contention that plaintiff might have changed his mind and refused to start in with the rest of the crew, and therefore he cannot be said to have been engaged in interstate

commerce when struck, appears to us entirely too technical. The same claim could have been made in the Seale case and others. It seems to us it is not so determinative whether plaintiff knew that he should shovel out the pit as whether the foreman ordered him there for that purpose. The authorities from the state courts and the lower Federal courts, in respect to when an employe directed to engage in work closely connected with interstate commerce comes under the protection of the Federal Employer's Liability Act, although he has not actually begun such work, are collected in 10 A. L. R. 1196, on page 1239, note to Southern Pac. Co. v. Industrial Acc. Com. 251 U. S. 259, 40 Sup. Ct. 130, 64 L. ed. 258.

In our opinion plaintiff made a prima facie case for recovery under the act of Congress.

The order is reversed.