# S. J. Prince *v.* Nashville, C. & St. L. Ry.*

## (*Jackson.*   April Term, 1925.)

1. ·COMMERCE. Workmen's Compensation Act held inapplicable to injuries sustained by section hand while engaged in ''interstate commerce.''

Section hand, who was injured while engaged in "scalping" bank or dump preparatory to unloading trainload of gravel intended for immediate use in ballasting defendant's interstate track, over which several interstate trains passed daily, was engaged with defendant in interstate commerce, and any cause of action arising out of such injury would be governed by federal Employers' Liability Act of 1908 (U. S. Comp. St., sections 8657-8665) and amendments thereto, and not by Workmen's Compensation Act. (*Post, pp. 195-200.*)

Acts cited and construed: Acts 1919, ch. 123.

Cases cited and approved: C., N. O. & T. P. Ry. Co. v. Morgan, 139 Tenn., 31; Thornhill, Admx., v. James C. Davis, Director General of Railroads, 121 S. C., 49; Stavors v. C., M. & St. P. R. R. Co. et al., 151 Minn., 251; Hines v. Industrial Comm., 295 Ill., 231; K. C. Southern R. Co. v. Leinen, 144 Ark., 454; Johnson v. Atlantic Coast Line R. Co., 116 S. C., 135; Goupiel v. Grand Trunk R. Co., 94 Vt., 337; Kennelly v. Northern P. R. Co., 48 N. D., 685; Erie R. Co. v. Szary, 253 U. S., 86;

Cases cited and distinguished: Shanks v. Delaware, L. & W. R. Co., 239 U. S., 556; Hines v. Industrial Accident Commission, 184 Cal.,

---

*As to what employees are engaged in interstate commerce within the Federal Employers' Liability Act, see notes in 10 A. L. R., 1184; 14 A. L. R., 732, 24 A. L. R., 634.

1;  Erie Railroad Co. v. Collins, 253 U. S., 77; Pedersen v. Delaware, L. & W. R. Co., 229 U. S., 146.

2. **COMMERCE.** Maintenance of interstate railway is interstate commerce.

Maintenance of an interstate railway is interstate commerce. (*Post, p.* 201.)

---

*Headnotes 1. Commerce, 12 C. J., Sections 57, 101; Workmen's Compensation Acts, C. J., Section 31; 2. Commerce, 12 C. J., Sections 48, 57.

---

FROM CARROLL.

---

Appeal from the Chancery Court of Carroll County.— Hon. Thos. C. Rye, Chancellor.

Maddox & Maddox, for complainant.

John T. Peler, for defendant.

Mr. Justice Hall delivered the opinion of the Court.

The petitioner, S. J. Prince, filed his petition in the chancery court of Carroll county, against the Nashville, Chattanooga & St. Louis Railway, seeking compensation under the workmen's compensation statute (chapter 123, Acts of 1919), for an injury sustained by him in January, 1922, while in the employ of defendant, and which injury arose out of and in the course of his employment.

Defendant answered the petition, setting up the following defenses:

(1)   That defendant was an interstate railway operating between the States of Kentucky, Alabama, and into the State of Georgia, to the city of Atlanta, and that at

the time petitioner sustained his injury both defendant and petitioner were engaged in interstate commerce, and therefore the workmen's compensation statute was inapplicable to said injury.

(2)   That notice was not given defendant of said accident and injury, as required by the provisions of the workmen's compensation statute.

The cause was heard before the chancellor on oral testimony. He held that petitioner was entitled to the relief sought in his bill; that he was earning $13.44 per week at the time of his injury, and was entitled, under the workmen's compensation statute, to recover $6.72 per week; said sum being one-half of his weekly wage for a period not to exceed one hundred weeks, and that the payments should begin on the 11th day of October, 1924, the day after the injury occurred; and the judgment also taxed defendant with the costs of the cause.

From this judgment defendant appealed to this court, after its motion for a new trial had been overruled, and it has assigned errors.

Petitioner was injured while working for defendant as a section hand on October 10, 1924. At the time of receiving the injury complained of, petitioner, with other section hands, was working on section No. 14 of defendant's track in Carroll county, Tenn., and was engaged in "scalping" the bank or dump preparatory to unloading a trainload of gravel intended for immediate use in ballasting defendant's track. On this point petitioner testified as follows:

"Q.   You had been working on the section over here, you say, for a year?   A.   Yes, sir.

"Q. You had done some similar work before that day to what you were doing at the time you were injured? A. Yes, sir.

"Q. And they were improving the tract there, were they not? A. Yes, sir.

"Q. And, in order to improve the track, they had to unload gravel along there? A. Yes, sir.

"Q. They had unloaded gravel in the same way before that time? A. Yes, sir.

"Q. And that gravel had been put on the dump on the side of the roadbed, and then worked right under the track right there? A. Yes, sir.

"Q. And that is what they were doing at the time you got injured? A. Yes, sir.

"Q. You were looking for the train of gravel at the time you were injured. A. Yes, sir.

"Q. And it came in an hour, didn't it? A. Yes, sir.

"Q. And they stopped there and unloaded the gravel right along there where you were injured, wasn't it? A. Yes, sir.

"Q. And that gravel, part of it, was put under the track that day, wasn't it? A. I don't recollect; I went home and went to the doctor's office.

"Q. You went right back up there? A. Yes, sir; but they hadn't got it unloaded when I came on back. The train was still there.

"Q. When they were unloading the gravel from the train, a part of it fell into the track, didn't it? A. Yes, sir; some of it.

"Q. And all of that gravel that was unloaded there was used right along at the place where it was unloaded?

A.   Well; I suppose so—I don't know whether it was or not.

"Q.   It was being placed there for immediate use at that point, and that is the way they had been handling it all the time?   A.   Yes, sir.

"Q.   Now, they used that track there at that place, didn't they, Mr. Prince, to run trains from other States —through trains, came out of Illinois and Kentucky, and were used there for the purpose of running those trains on into Alabama, Georgia, and Atlanta, isn't it?   A.   I suppose so."

Harvey Windsor, a witness offered in petitioner's behalf, testified as follows:

"Q.   What was done with the gravel when it arrived first?   A.   It was got off the train first—unloaded with the shovels.

"Q.   Unloaded where—on the side of the track or not?   A.   Yes, sir; on the side of the track.

"Q.   Then, after it was unloaded, what was done with it?   A.   Put on the track; throwed on the track with the shovels.

"Q.   Was it put on the track directly from the car, or was it thrown on the ground and then transferred to the track?   A.   It was unloaded onto the ground, and then transferred into the track."

On cross-examination this witness testified as follows:

"Q.   On the morning of this injury you were, as I understand, cleaning off the side of the dump over the bed?   A.   Yes, sir.

"Q.   That is, above the dump on the level with the end of the cross-ties there?   A.   Yes, sir.

"Q. And that was being done for the purpose of unloading that train of gravel? A. Yes, sir.

"Q. And the gravel was being put there for the immediate use on the bed? A. Yes, sir.

"Q. That was the regular and customary way of handling that gravel, wasn't it? A. Yes, sir.

"Q. And Mr. Prince knew that fact? A. Yes, sir.

Bill French, another witness testifying in petitioner's behalf, testified as follows:

"Q. In cleaning off that dump there it was also in addition to dumping that gravel there, to drain the tract? A. Yes, sir.

"Q. And that was necessary? A. Yes, sir.

"Q. This is the same line of railroad that runs from Atlanta, Georgia, through the State of Georgia, Alabama, and Tennessee and on to Hickman, Kentucky? A. Yes, sir.

"Q. There were trains from Georgia that passed over that tract in a few minutes after the occurrence, wasn't there? A. The gravel train?

"Q. Wasn't there some through trains from Florida that came there? A. I don't know where they came from.

"Q. They do do that? A. Yes, sir; they do that."

It is uncontroverted that the track on which petitioner was working at the time he was injured was an interstate track, over which several interstate trains passed daily.

In "scalping" the top of the dump petitioner used a shovel, which struck some small object on the side of the bank, causing it to fly up and strike him in the right eye and permanently destroy the vision of that eye.

After petitioner was injured he went to see the local surgeon at Junction City, which is a town located near the point where the injury occurred. He was subsequently sent by the section foreman to Nashville to see the chief surgeon of the defendant, and was finally sent to the hospital, where his eye was treated for several days. But, as before stated, the injury resulted in the total loss of vision in that eye.

Through its first assignment of error defendant insists that there is no evidence to support the chancellor's judgment.

Through its second assignment of error defendant insists that the chancellor's judgment is erroneous because the undisputed evidence shows that both petitioner and defendant were engaged in interstate commerce at the time petitioner received his injury, and that there was no proof which tended to show that petitioner and defendant were engaged in intrastate commerce at the time of the alleged injury, and that the undisputed proof shows that the cause of action arising out of said injury, if any, would be governed by the federal Employers' Liability Act of 1908 (U. S. Comp. St., sections 8657-8665) and amendments thereto, and not by the workmen's compensation statute (chapter 123, Acts of 1919).

We are of the opinion that the undisputed evidence, which is set out above, shows that both petitioner and defendant were engaged in interstate commerce at the time of petitioner's injury, and that the workmen's compensation statute has no application to said injury whatsoever.

By section 6 of the workmen's compensation statute it is provided as follows: "That this act shall not apply to:

"(a)   Any common carrier doing an interstate business while engaged in interstate commerce."

In *Shanks* v. *Delaware, L. & W. R. Co.,* 239 U. S., 556, 36 S. Ct., 188, 60 L. Ed., 436, L. R. A., 1916C, 797, it was held that the true test of employment in interstate commerce in the sense intended is: "Was the employee at the time of the injury engaged in interstate transportation or in work so closely related to it as to be practically a part of it."

In *Hines* v. *Industrial Accident Commission,* 184 Cal., 1, 192 P., 859, 14 A. L. R., 720, it was said: "The general test as to the character of the employment is whether the employee was engaged in an act so directly and immediately connected with interstate business as substantially to form a part or necessary incident thereof."

To the same effect is our own case of *C., N. O. & T. P. Ry Co.* v. *Morgan,* 139 Tenn., 31, 201 S. W., 128.

In *Thornhill, Admx.,* v. *James C. Davis, Director General of Railroads,* 121 S. C., 49, 113 S. E., 370, 24 A. L. R., 617, it was held that the foreman of a track repair and maintenance force, clearing the tracks and right of way of an interstate carrier which is used in carrying passengers and freight for hire in interstate commerce, is engaged in such commerce within the protection of the federal Employers' Liability Act.

In *Stavors* v. *Chicago, Milwaukee & St. Paul Railroad Co. et al.,* 151 Minn., 251, 186 N. W., 942, 24 A. L. R., 630, it was held that an ash or cinder pit where are dumped the ashes and cinders from engines engaged both in intrastate and interstate commerce, and which is a necessary facility in the operation of the railway, is also a facility or instrumentality used in interstate commerce,

so that persons engaged in cleaning out or emptying such pit should be held engaged in work in furtherance of such commerce.

It was held in *Hines* v. *Industrial Commission*, 295 Ill., 231, 129 N. E., 175, that one engaged in hauling stringers to repair a bridge in an interstate track is engaged in interstate commerce.

In *Kansas City Southern R. Co.* v. *Leinen*, 114 Ark., 454, 223 S. W., 1, it was held that one engaged in hauling ballast for use on the main line of an interstate railway is in interstate commerce.

In *Johnson* v. *Atlantic Coast Line R. Co.*, 116 S. C., 135, 107 S. E., 31, it was held that a section hand is within the protection of the federal Employers' Liability Act when engaged in cutting a rail while repairing a track used for interstate traffic.

In *Goupiel* v. *Grand Trunk R. Co.*, 94 Vt., 337, 111 A., 346, it was held that section men engaged in replacing worn ties on an interstate road are engaged in interstate commerce while they have stepped aside to permit an interstate train to pass.

In *Kennelly* v. *Northern P. R. Co.*, 48 N. D., 685, 186 N. W., 548, it was held that a section man engaged in clearing snow from a highway crossing on a track used for interstate and intrastate commerce is engaged in interstate commerce within the protection of the federal statute, and recovery may be had under that statute if he is injured, regardless of whether the train which injured him is interstate or intrastate in character.

In *Erie R. Co.* v. *Szary*, 253 U. S., 86, 40 S. Ct., 454, 64 L. Ed., 794, it was held that an employee who was injured while carrying ashes to an ash pit from stoves used

in drying sand in a small structure standing in the yards of the railroad company, the same being used for engines engaged in interstate and intrastate commerce indiscriminately, was engaged in interstate commerce.

In *Erie Railroad Co.* v. *Collins,* 253 U. S., 77, 40 S. Ct., 450, 64 L. Ed., 790, the action was instituted under the federal Employers' Liability Act on the following state of facts:

"The following are the allegations of the complaint stated narratively:

"December 25, 1915, and prior thereto, defendant was an operator of a steam railroad and engaged in interstate commerce. On and prior to that date plaintiff as an employee of defendant operated a signaling tower and water tank in the town of Burns, N. Y., the tower being used for the operation of trains in interstate and intrastate commerce. The tank was used for supplying the locomotives of the trains with water, which was pumped from a close-by well into the tank by a gasoline engine which plaintiff ran.

"In the nighttime of December 25, 1915, while plaintiff was engaged in starting the engine the gasoline suddenly exploded burning him and seriously and painfully and permanently injuring him, causing him immediate and permanent suffering and the expenditure of large sums of money, by all of which he was damaged in the sum of $25,000."

In that case the court said: "It can hardly be contended that while plaintiff was engaged in the signal tower he was not engaged in interstate commerce, though he may have on occasion signaled the approach or departure of intrastate trains. But it is contended that when

he descended from the tower and went to the pumping station he put off an interstate character and took on one of intrastate quality or, it may be, was divested of both and sank into undesignated employment. A rather abrupt transition it would seem at first blush, and, if of determining influence, would subject the Employers' Liability Act to rapid changes of application, plaintiff being within it at one point of time and without it at another—within it when on the signal tower, but without it when in the pumphouse, though in both places being concerned with trains engaged in interstate commerce.''

In *Pedersen* v. *Delaware, L. & W. R. Co.*, 229 U. S., 146, 33 S. Ct., 648, 57 L. Ed., 1125, Ann. Cas., 1914C, 153, the defendant was operating a railroad for the transportation of passengers and freight in interstate and intrastate commerce. The plaintiff was an iron worker, employed by defendant in the alteration and repair of some of its bridges or tracks at or near Hoboken, N. J. On the afternoon of the injury plaintiff and another employee, acting under the direction of the foreman, were carrying from a tool car to a bridge known as the Duffield Bridge some bolts or rivets, which were to be used by them that night or very early the next morning in repairing the bridge. The repair consisted of taking out an existing girder and inserting a new one. The bridge could be reached only by passing over an intervening temporary bridge at James avenue. These bridges were being regularly used in both interstate and intrastate commerce. While plaintiff was carrying a sack of bolts or rivets over the James avenue bridge, on his way to the Duffield bridge, he was run down and injured by an intrastate passenger train.

The action for damages was brought under the federal Employers' Liability Act, and the court said:

"Considering the terms of the statute, there can be no doubt that a right of recovery thereunder arises only where the injury is suffered while the carrier is engaged in interstate commerce and while the employee is employed by the carrier in such commerce. . . .

"Tracks and bridges are as indispensable to interstate commerce by railroad as are engines and cars, and, sound economic reasons unite with settled rules of law in demanding that all of these instrumentalities be kept in repair. The security, expedition and efficiency of the commerce depends in large measure upon this being done. Indeed, the statute now before us proceeds upon the theory that the carrier is charged with the duty of exercising appropriate care to prevent or correct 'any defect or insufficiency . . . in its cars . . . track, roadbed . . . ' used in interstate commerce. . . . The true test always is: Is the work in question a part of the interstate commerce in which the carrier is engaged? . . .

"True, a track or bridge may be used in both interstate and intrastate commerce, but when it is so used it is none the less an instrumentality of the former; nor does its double use prevent the employment of those who are engaged in its repair or in keeping it in suitable condition for use from being an employment in interstate commerce. . . .

"What has been said shows that there was evidence to sustain a finding that at the time of the plaintiff's injury the defendant was engaged, and he was employed by it, in interstate commerce."

Section 6 of our workmen's compensation statute expressly excludes any common carrier engaged in interstate commerce.  The defendant, at the time petitioner was injured, was engaged in maintaining its track over which interstate trains operated.  Maintenance of an interstate railway, under all the authorities, is interstate commerce.  Therefore, by the very language of our compensation statute, defendant, being so engaged at the time petitioner received his injury, is excluded.

It results that the chancellor's judgment will be reversed, and petitioner's suit dismissed, with costs.